KLEINWORT BENSON NORTH AMERICA, INC., Plaintiff-Appellee, v. QUANTUM FINANCIAL SERVICES, INC., Defendant-Appellant and Counterplaintiff-Appellant (Kleinwort Benson North America, Inc., et al., Counterdefendants-Appellees).

First District (2nd Division)   No. 1—95—4384

Opinion filed November 6, 1996.

Jenner & Block, of Chicago (Anton Valukas, Charles Sklarski, and Janice Hornaday, of counsel), for appellant.

Kirkland & Ellis, of Chicago (J. Andrew Lanagan and James Boland, of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Claiming the existence of genuine, material issues of fact, counterplaintiff Quantum Financial Services, Inc. (Quantum),[1] appeals the grant of summary judgment in favor of counterdefendants Kleinwort Benson North America, Inc., Kleinwort Benson Ltd. (collectively, Kleinwort), and Marcus Hutchins on two counts of Quantum's counterclaims. Quantum also appeals from the order dismissing the remaining counts of Quantum's counterclaims as moot, as well as an earlier ruling of the circuit court dismissing its counterclaim for rescission.

Quantum questions whether the circuit court correctly ruled as a matter of law that (1) Kleinwort's alleged misrepresentations were immaterial; (2) Quantum sustained no damage from Kleinwort's alleged fraud and breach of contract; and (3) Quantum's claim for rescission was improperly dismissed.

The documents filed in support of and in opposition to Kleinwort's summary judgment motion, read most strictly against Kleinwort and most liberally in favor of Quantum (*Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986)), reveal the following facts.

Quantum, a futures commissions merchant, provided trade clearing and execution services for its futures exchange clients. In 1991, it decided to expand its client base to include institutional clients, such as banks. Virginia Trading Corporation (VTC) was identified to it as a company having such business. VTC was wholly owned by Kleinwort. In the business community, VTC was known to service "high profile institutional accounts." After Quantum contacted Kleinwort about acquiring VTC, the parties began negotiating.

In April 1991, in the midst of negotiations for the VTC purchase, Kleinwort disclosed to Quantum information about VTC in a confidential five-page memorandum entitled "Project Troy." The introduction to Project Troy stated that "Quantum *** has approached Kleinwort *** to express its interest in acquiring the

---

[1]Quantum was acquired by a third party during the proceedings in the circuit court and transferred its interest in this controversy to its prior owners, Leslie Rosenthal and J. Robert Collins, the real parties in interest in this appeal.

brokerage division of its wholly-owned subsidiary, Virginia Trading Corporation [VTC]. In connection with this proposal, Kleinwort *** is hereby providing certain information on the brokerage division." Project Troy provided a "Statement of Income" and a "Schedule of Membership Seats."

A portion of the report discussed VTC's workforce. The Project Troy memorandum stated:

"VTC employs 50 individuals in its brokerage division. *A seasoned six-man marketing team with over 50 years of combined industry experience leads the brokerage sales effort. VTC's execution is acknowledged to be among the best in the industry.* Exchange floor locations are staffed by experienced personnel, totalling 27." (Emphasis added.)

On May 31, 1991, one month after Quantum received the Project Troy memorandum, Quantum offered to purchase VTC by buying 100% of VTC's outstanding stock for approximately $6 million in cash and commissions. Kleinwort accepted Quantum's offer and the parties executed a "Stock Purchase and Brokerage Agreement" (Agreement) on June 30, 1991. The Agreement provided that the closing for the sale would be at 10 a.m. on July 31, 1991.

During the course of Quantum's prepurchase investigation, Quantum's then chairman, Leslie Rosenthal, asserted that if it were not for VTC's "impressive institutional client base," Quantum would not be interested in purchasing VTC. Kleinwort disclosed to Quantum the identity of the individuals who made up VTC's "seasoned six-man marketing team" to which it referred in the Project Troy memorandum. Quantum alleged that this marketing team constituted an important component of the premium over book value of assets that Quantum was willing to pay for VTC because it needed a viable institutional sales force in order to maintain and increase the type of institutional client base it sought to purchase.

After the Agreement was signed, Kleinwort gave Quantum copies of VTC's employment agreements with each of its six "seasoned" salespersons. These documents listed the accounts for which the individual salesperson received commissions. Quantum believed that the salespersons had personal relationships with the clients listed in their employment agreements and that the salespersons received commissions on the clients' trades because of their activities involving the client.

These employment agreements were listed as "material contracts" under the Agreement. The terms of the Agreement included Kleinwort's representation that "[u]nder the heading 'Material Contracts,' the Seller Disclosure Schedule contains a listing or de-

scription of all material business contracts to which VTC *** will be a party." The Agreement also stated that "each such contract is in full force and effect in all material respects" and would remain so at the time of the closing. Kleinwort explicitly acknowledged in the Agreement that it made these representations about the "material contracts" as a "material inducement" to Quantum to enter into the Agreement and consummate the purchase of VTC.

Only three members of VTC's above-mentioned "seasoned six-man marketing team" actually handled a "significant" amount of institutional business: Edward Boehm, John Legittino, and David Gibbs. Due to unfavorable reports Quantum obtained from Marcus Hutchins, VTC's chief executive officer, concerning Boehm, Quantum bought out Boehm's employment contract for $112,903. Legittino, who supervised one of VTC's largest accounts, "Nippon," and received a large percentage of resultant commissions, left VTC two weeks before the closing date of the Agreement, taking the Nippon account with him.

Of the three experienced employees handling a significant amount of VTC's business then, only David Gibbs remained prior to the closing. According to his employment letter, Gibbs was responsible for, and received commissions on, some of VTC's biggest and most prominent institutional clients: NCNB, First Union Corp., Dominion Bank, Mellon Bank and Norwest. Two of these accounts were among the six named "large [institutional] accounts" listed by Kleinwort in its Project Troy disclosures to Quantum. Gibbs also had responsibility for soliciting new accounts and developing further business with his existing accounts.

In June or July of 1991, Gerald Laurain, Quantum's institutional sales manager, met with Gibbs to discuss Quantum's plans and Gibbs' prospective new role within Quantum. Laurain asked Gibbs many questions about Gibbs' clients, including the names of the "key players," when Gibbs last saw these players, and when Laurain and Gibbs should schedule visits with them to discuss Quantum's acquisition of VTC. Gibbs did not then tell Laurain that he was considering leaving VTC or that he was leaving VTC.

Nevertheless, Quantum heard a rumor that Gibbs was considering leaving VTC and immediately made inquiries to Kleinwort. At that point, Quantum was concerned that if Gibbs left, it no longer would be purchasing an institutional sales force to service the client base. Quantum attempted to speak with Gibbs, but could not locate him because he was on vacation and "incommunicado" from July 8 to July 29.

As the closing date approached, Quantum grew more concerned

about the status of Gibbs. Rosenthal sought specific assurances from Hutchins by asking him if Gibbs was leaving VTC. According to Rosenthal, Hutchins alleviated his concerns by stating that "given Gibbs' history, there's absolutely no way that he would ever pick up and leave [VTC] because [Hutchins] was basically responsible for the education and experience and value-added *** services that Gibbs provided to anybody, and in fact Gibbs would not think of leaving [VTC's] employ if [Hutchins] told him not to." Hutchins allegedly was asked to inform Quantum if anything happened with Gibbs because Quantum believed that Gibbs was responsible for a meaningful portion of VTC's institutional client base. Hutchins was advised that the structure of the deal would be dramatically altered if, after Legittino left, Gibbs also left.

Unknown to Quantum, during the time Gibbs was on vacation, he was meeting with high-ranking officers from Barclays de Zoehe Wedd Securities (BZW) about possible employment in its newly formed futures commission organization. Gibbs met with BZW's managing director, institutional sales manager, and three executive directors. Gibbs told the BZW officers that he possibly could bring clients with him from VTC to BZW. Gibbs also represented to BZW that he had positive relationships with his clients and that he helped develop VTC's business with several large banks. BZW then offered Gibbs a job as an institutional salesperson, starting August 5, 1991.

On July 29, two days before the scheduled July 31 closing of Kleinwort's VTC sale to Quantum, Gibbs returned from vacation and went to VTC's offices to resign. Gibbs told Hutchins of his job offer and stated that he wanted to resign, effective immediately, while Kleinwort still owned VTC. Instead of accepting his resignation that day as Gibbs requested, Hutchins asked Gibbs to return on the afternoon of Wednesday, July 31, the day of the closing, and then resign. Gibbs replied that he would make an official statement of resignation on the morning of July 31, instead of the afternoon, because he understood (mistakenly) that the closing of the sale to Quantum would take place at noon. Gibbs in fact tendered his official resignation from VTC to Hutchins before noon on July 31, 1991.

On the date of the closing, rumors continued to circulate regarding Gibbs' employment status at VTC. Laurain again sought to ascertain the facts, but could not locate Gibbs. Laurain talked to Hutchins. Despite the fact that Gibbs already had resigned, Hutchins lied and told Laurain he did not think that Gibbs was leaving. Instead, Hutchins responded that he had advised Gibbs against leaving and would be very surprised if Gibbs actually left.

Quantum did not learn of Gibbs' resignation until the afternoon

of July 31, after the closing and after Quantum had wired approximately $6 million to Kleinwort to purchase VTC. When it learned of Gibbs' resignation, Quantum immediately tried to stop the wire transfer to Kleinwort, but was unable to do so. That evening, Quantum's attorney faxed a letter to VTC advising that Quantum considered Kleinwort to be in breach of the Agreement for its failure to inform Quantum about the departures of Legittino and Gibbs. The letter suggested that the principals of Quantum and Kleinwort meet to resolve the matter.

During early August 1991, Rosenthal met with Hutchins and Brian Manning, chairman of VTC's board, to discuss the departures of Legittino and Gibbs. Hutchins and Manning lied again and assured Quantum that they had not been forewarned of the resignations of Legittino and Gibbs nor withheld or misrepresented information to Quantum about those resignations. In reliance on these assurances, Quantum withdrew the July 31, 1991, letter, which stated that Kleinwort had breached the agreement.

Kleinwort and Hutchins concede in their brief filed in this court, however, the following:

> "There is evidence in the record suggesting that—prior to the closing on July 31, 1991—a junior VTC salesman named David Gibbs had resigned from VTC, that the Kleinwort Parties failed to inform Quantum of this event, and the Kleinwort Parties (through Marcus Hutchins) may have misrepresented to Quantum their knowledge regarding Gibbs' employment status. *** For purposes of both their summary judgment motion and this appeal, the Kleinwort Parties will assume that Quantum's allegations of nondisclosure and misrepresentations of Gibbs' employment status are true."

Kleinwort and Hutchins' concession of misrepresentation is supported by Gibbs in his March 28, 1994, deposition, where he stated that on July 29, 1991, he told Hutchins he was resigning, "effective immediately." Gibbs further told Hutchins that it was very important to him that he resign to VTC, not Quantum. According to Gibbs, Hutchins asked him to resign on the afternoon of July 31. Gibbs declined because he believed that the closing of Quantum's purchase of VTC would take place at noon on July 31. Gibbs told Hutchins that he would resign on the morning of July 31. Gibbs resigned from VTC before the closing took place.

On August 14, 1992, Kleinwort and Fenchurch Capital Manage-

ment, which maintained an account at VTC,[2] filed a complaint against Quantum. In count I, Kleinwort and Fenchurch sought a declaratory judgment that Kleinwort and Fenchurch did not breach their agreement with Quantum or make a material misrepresentation with regard to Gibbs' departure. In count II, Kleinwort and Fenchurch sought the same relief, but with regard to Legittino's departure. In count III, Kleinwort alleged that Quantum breached the agreement by failing to pay Kleinwort money due under the Agreement. In counts IV, V, and VI Kleinwort sought declaratory judgments and damages for Quantum's failure to make payments under the Agreement. Counts VII and VIII pertained to Fenchurch's claims against Quantum. Finally, in count IX, Kleinwort and Fenchurch sought damages for Quantum's breach of the Agreement with respect to the payment of commissions.

On October 26, 1992, Quantum filed an answer and counterclaims. In count I of its counterclaims, Quantum sought rescission against Kleinwort, specifically alleging that it had "offered to return the stock in VTC to Kleinwort in exchange for refund of the purchase price." In count II of its counterclaims, Quantum pled a cause of action for common law fraud against Kleinwort, Fenchurch, Marcus Hutchins and Brian Manning. Count III of Quantum's counterclaims pled a cause of action for breach of express warranties against Kleinwort. The circuit court permitted Quantum to file second amended counterclaims.[3] Quantum's second amended count I for rescission, however, was then dismissed by the chancery court.

The chancery court transferred the cause to the law division of the Cook County circuit court on Kleinwort's motion. Kleinwort and Hutchins moved for summary judgment on all punitive damage claims and counts II and III of Quantum's second amended counterclaims. On December 1, 1995, the court entered summary judgment in favor of Kleinwort and against Quantum on Quantum's second amended counterclaims and dismissed remaining claims on Kleinwort's declaratory judgment action as moot. This appeal followed.

I

Summary judgment, a drastic remedy to be granted only when such remedy is clear and free from doubt (*Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 234, 569 N.E.2d 55, 58 (1991)), should be allowed only where the pleadings, depositions, admissions, exhibits and affidavits in the record demon-

---

[2]The precise interest of Fenchurch in this litigation is unclear.

[3]Brian Manning was dismissed on motion. Quantum and Fenchurch voluntarily dismissed their respective counterclaims against each other.

strate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Vicorp Restaurants v. Corinco Insulating Co.*, 222 Ill. App. 3d 518, 525, 584 N.E.2d 229, 234 (1991), *appeal denied*, 144 Ill. 2d 643, 591 N.E.2d 32 (1992). In making that determination, the foregoing documents must be construed strictly against the movant and liberally in favor of the respondent (*Mitchell v. Jewel Food Stores*, 142 Ill. 2d 152, 165, 568 N.E.2d 827 (1990)), and if reasonable persons could draw different conclusions or inferences from undisputed evidence, summary judgment must be denied. *Skipper*, 210 Ill. App. 3d at 236. See also *Ainsworth Corp. v. Cenco Inc.*, 107 Ill. App. 3d 435, 438-39, 437 N.E.2d 817, 820 (1982).

■ A circuit court's decision granting summary judgment is reviewed *de novo*. *Zoeller v. Augustine*, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995); *Myers v. Health Specialists, S.C.*, 225 Ill. App. 3d 68, 72, 587 N.E.2d 494, 497 (1992), *appeal denied*, 145 Ill. 2d 635, 596 N.E.2d 630 (1992). *De novo* review does not require deference to the judgment of the circuit court, but the facts and law are considered *ab initio* to determine whether the decision was correct. *Frigo v. Motors Insurance Corp.*, 271 Ill. App. 3d 50, 57, 648 N.E.2d 180, 184 (1995); *Jarke v. Jackson Products*, 258 Ill. App. 3d 718, 721, 631 N.E.2d 233, 236 (1994).

■ An order granting a motion to dismiss pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1994)) is proper only when no set of facts would sustain the claim. *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 302, 655 N.E.2d 1162, 1165 (1995). A dismissal for failure to state a cause of action involves a question of law; consequently, this review also is *de novo* and independent of the reasoning of the circuit court on the question. *Metrick v. Chatz*, 266 Ill. App. 3d 649, 652, 639 N.E.2d 198, 200, *appeal denied*, 158 Ill. 2d 553, 645 N.E.2d 1359 (1994).

II

Quantum first argues that the circuit court erred when it ruled, as a matter of law, that Kleinwort's misrepresentations and omissions regarding David Gibbs were immaterial.

■ A misrepresentation is material if the plaintiff would have acted differently had he been aware of the falsity of the statement. *Black v. Iovino*, 219 Ill. App. 3d 378, 391, 580 N.E.2d 139, 147 (1991), *appeal denied*, 143 Ill. 2d 636 (1992); *Brown v. Broadway Perryville Lumber Co.*, 156 Ill. App. 3d 16, 24, 508 N.E.2d 1170, 1176 (1987); *Buechin v. Ogden Chrysler-Plymouth, Inc.*, 159 Ill. App. 3d 237, 248, 511 N.E.2d 1330, 1337 (1987); *Chapman v. Hosek*, 131 Ill. App. 3d 180,

186, 475 N.E.2d 593, 598 (1985); *Obermaier v. Obermaier*, 128 Ill. App. 3d 602, 606, 470 N.E.2d 1047, 1051 (1984); *Perlman v. Time, Inc.*, 64 Ill. App. 3d 190, 197, 380 N.E.2d 1040, 1046 (1978). A misrepresentation also is material if the one making it knew that the statement was likely to induce the recipient to engage in the conduct in question. *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 49, 390 N.E.2d 393, 404 (1979). See also *Restatement (Second) of Torts* § 538(2)(b), at 80 (1977).

Although Kleinwort suggests that Gibbs' importance to Quantum was undisclosed, there is record evidence from which a fact finder could conclude that Kleinwort lied to Quantum because it knew Quantum would not have closed the deal had it known the truth about Gibbs' resignation. Kleinwort was told several times that the only reason Quantum wished to purchase VTC was to acquire an institutional client base. Kleinwort touted Gibbs as a member of the "seasoned" six-person sales team for institutional clients highlighted in the confidential Project Troy memorandum. Two other such seasoned salesmen already had left. Gibbs had been servicing high-profile institutional clients. The Agreement between Quantum and Kleinwort itself listed Gibbs' employment as material to the sale. Quantum inquired several times about Gibbs' employment status. Kleinwort, admittedly, knowingly lied to Quantum about Gibbs' employment status.

Were these knowing lies material? Kleinwort says no; however, substantial evidence demonstrates that in order to induce Quantum to purchase VTC, Kleinwort heralded VTC's sales force in the Project Troy memorandum it prepared for Quantum. Kleinwort counted Gibbs as one of its six "seasoned" salespersons, and represented him to be the responsible salesperson for several of VTC's most prominent accounts. As an acknowledged "material inducement" to persuade Quantum to enter into and consummate the Agreement, Kleinwort represented that Gibbs' employment agreement constituted a "material contract" that would be in full force and effect at the time of closing.

Even after the parties signed the Agreement, which had acknowledged Gibbs' contract as "material," Quantum continued to inquire of Kleinwort about Gibbs. After the departure of Legittino, Rosenthal specifically asked Hutchins to advise him of any further "defections," and later specifically asked Hutchins if Gibbs was leaving, because Quantum considered Gibbs to be important. On the day of closing, Laurain expressly asked Hutchins whether Gibbs was leaving, and Hutchins lied when he answered in the negative. When Quantum learned that Gibbs resigned, it immediately, but unsuccessfully, tried to stop the wire transfer of approximately $6 million to Kleinwort.

■ A fact finder reasonably could conclude from the foregoing that Quantum would have acted differently if Kleinwort had been truthful about Gibbs' employment status and that Kleinwort knew that lying about Gibbs would induce Quantum to proceed with the closing. Given this evidence, it is for the fact finder to determine whether Kleinwort's misrepresentations were material, not the circuit court as a matter of law.

Accordingly, the circuit court erred. The grant of summary judgment on count II, therefore, must be reversed and the cause remanded for trial.

## III

The circuit court ruled that Kleinwort was entitled to summary judgment because Quantum failed to produce any evidence showing it was damaged by Kleinwort's fraud or breach of contract.

Kleinwort asserts that there was no difference in the value of VTC with or without Gibbs. At the time the Agreement was signed on June 30, 1991, Quantum bargained with Kleinwort to buy VTC, which Kleinwort claimed possessed both an institutional client base and an institutional sales force, which included Boehm, Legittino and Gibbs. Between June 30 and July 31, Boehm and Legittino left that sales force, leaving Gibbs as the only remaining experienced institutional salesperson having had significant customer contacts. Within hours of sending a wire transfer of $6 million to Kleinwort on July 31, 1991, Quantum learned the truth about Gibbs having resigned from VTC prior to the closing.

Direct record evidence would permit a fact finder reasonably to conclude that Gibbs added value to VTC. Gibbs, a member of VTC's self-proclaimed "seasoned six-man marketing team," as listed in the Project Troy memorandum, was one of only three team members with significant experience in handling institutional accounts. He was the only one remaining at VTC at the time before the closing. Gibbs' letter of employment with VTC contained an impressive list of institutional clients with which he had day-to-day contact. He provided these customers with, what Hutchins described as, "value-added services." It was Gibbs who received commissions on their trades, buttressing the importance of his relationships to these clients.

A fact finder also could consider the conduct of BZW, Gibbs' new employer, as evidence supporting this evaluation of Gibbs as a salesperson. Gibbs testified that high-ranking officials at BZW interviewed him for a new sales position in July of 1991—the same month in which Quantum purchased VTC. Gibbs told BZW officials

that he had good personal relationships with his clients and possibly could deliver to BZW the very institutional clientele which Quantum thought it was acquiring. BZW hired him as an institutional salesperson.

As well, Kleinwort's own appraisement of Gibbs supports the foregoing evidence. Michael Griffin, one of Kleinwort's agents during the sale, admitted that a marketing team is an important factor to consider in valuing the firm. In connection with this sale, VTC proclaimed that it had a "seasoned six-man marketing team with over 50 years of combined industry experience," a factor that evidently added value to VTC. Manning, VTC's chairman, also admitted that VTC's "seasoned six-man marketing team" was a "positive attribute." In sum, a fact finder could conclude that Gibbs indeed was an important component of this team.

Kleinwort's other actions also present strong evidence from which a fact finder could infer that Gibbs was a valuable salesperson. If Gibbs had so little value to VTC's sale, as Kleinwort claims, Hutchins could have said as much when asked about the possibility of Gibbs leaving. Instead, he lied and denied any knowledge about Gibbs' resignation. An inference readily could be drawn that Hutchins would not have felt compelled to lie to Quantum about his resignation if Gibbs had no value.

The opinion given by Quantum's expert, Sheldon B. Cohen, also provides evidence that Gibbs' employment added value to VTC. Cohen testified that Gibbs had a lengthy list of reputable institutional business clients and that Gibbs was paid commissions on those clients' trades, an indication that he, rather than anyone else, had a material relationship with these clients. Because of his list of clients and his experience, Cohen testified that as of July 31, 1991, Gibbs was the most important salesperson left at VTC. See *Rock v. Pickleman*, 214 Ill. App. 3d 368, 377, 574 N.E.2d 682, 688 (1991).

■ There was evidence from which a fact finder can assess an amount of damage Quantum sustained on the date of closing, if any, through Cohen's testimony. In determining the amount of damages to be awarded in fraud cases, Illinois courts typically apply the "benefit-of-the-bargain" rule. See *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 196, 538 N.E.2d 530, 537-38, *cert. denied*, 493 U.S. 894, 107 L. Ed. 2d 193, 110 S. Ct. 243 (1989); *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 759, 625 N.E.2d 990, 998 (1993). Under this rule, damages are determined by assessing the difference between the actual value of the property sold and the value of the property had the representations been true. *Gerill*, 128 Ill. 2d at 196, 530 N.E.2d at 537-38. Was there a difference between the value VTC

would have had with Gibbs and the value of VTC without Gibbs, contrary to Kleinwort's assertion?

It was Cohen's opinion that, if Quantum were merely buying VTC's accounts, under the custom in the industry, it would not pay any premium over book value of assets, but pay only trailing commissions on those accounts for a period of time after the sale. According to Cohen, because Quantum bargained for an institutional sales force as part of the Agreement, the influx of human capital made it reasonable and appropriate to pay a premium over book value of assets. He estimated that premium at approximately $2 million, based upon: (1) the $1 million up-front cash payment by Quantum; (2) $749,104, which represents the cost of the free trading to Kleinwort's proprietary accounts under section 2.01(e) of the Agreement; and (3) Quantum's $112,903 buy-out of Boehm. The premium was negotiated between a willing seller and willing buyer and accurately reflected VTC's value over book on July 31, 1991, if the institutional sales force had been intact at the date of closing. See also *Posner v. Davis*, 76 Ill. App. 3d 638, 645, 395 N.E.2d 133, 138 (1979).

■ According to Cohen, Quantum did not receive what it bargained for. Although Quantum remained willing to close the deal after the departure of two institutional salespersons, the departure of Gibbs left VTC without any experienced institutional sales force. VTC, absent any institutional sales force, had no value beyond book value of assets. Quantum's damages due to Kleinwort's fraud and breach of contract therefore were computable. A question for a fact finder existed as to the amount of damages, if any, caused by Kleinwort's alleged fraud.

Further, a presumption of nominal damages obtains upon proof that a legal wrong has been committed; such damages are sufficient to sustain a cause of action. *In re Application of Busse*, 124 Ill. App. 3d 433, 438, 464 N.E.2d 651, 655 (1984). Assignees of fraud claims also have been permitted to receive punitive damages. *Federal Deposit Insurance Corp. v. W.R. Grace & Co.*, 691 F. Supp. 87, 92 (N.D. Ill. 1988), *aff'd in part & rev'd on other grounds*, 877 F.2d 614 (7th Cir. 1989); *First Federal Savings & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.*, 629 F. Supp. 427, 446-47 (S.D.N.Y. 1986). In *Grunloh v. Effingham Equity, Inc.*, 174 Ill. App. 3d 508, 528 N.E.2d 1031 (1988), relied upon by Kleinwort, the survivability of property damage claims which had been assigned was involved, not a claim for fraud as is here presented.

Accordingly, the circuit court's ruling, as a matter of law, that the departure of Gibbs caused no damage whatsoever to Quantum or its assignees, was error and must be reversed.

## IV

The circuit court granted Kleinwort summary judgment on Quantum's breach of contact claim, count III of the second amended counterclaim, to which Quantum assigns error. Article V at section 5.08 of the Agreement provided:

"Under the heading 'Material Contract,' the Seller Disclosure Schedule contains a listing or description of all material business contracts to which VTC or VFM will be a party after the consummation of the Restructuring Transactions. Each such contract is in full force and effect in all material respects, and neither VTC nor VFM is in breach of any such contract in any material respect."

Section 10.01(a) of the Agreement obligates Quantum to consummate the purchase of VTC, subject to the satisfaction or waiver of the following condition:

"The Seller's representations and warranties set forth in Article IV and Article V above will be true and correct in all material respects at and as of the Closing Time as though then made and as though the Closing Date were substituted for the date of this Agreement throughout such representations and warranties ***."

There is neither claim nor evidence that Quantum waived the condition that Gibbs' employment agreement would be in force at the time of closing.

■ A breach of contract claim requires proof of (1) the existence of a contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) the existence of damages resulting from the breach. *Village of Orland Park v. First Federal Savings & Loan Ass'n*, 135 Ill. App. 3d 520, 529, 481 N.E.2d 946, 952 (1985). There was sufficient evidence in the record showing that Kleinwort breached the Agreement by representing Gibbs' employment contract as having been in full force and effect at the time of closing, when Kleinwort knew Gibbs already had resigned.

■ Kleinwort asserts that summary judgment was proper because (1) the breach was not material and (2) the breach caused no damage, basing its materiality argument on the terms of the Agreement; however, nothing in the Agreement requires Quantum to "show through independent means that Gibbs' continued employment was material in order to establish [its] breach of contract claim," as Kleinwort suggests. Section 11.03 of the Agreement provides that "[t]he Seller will indemnify the Buyer *** against *any loss* *** which the Buyer may suffer *** as a result of the breach by the Seller of *any representation* *** contained in *** Article V above." (Emphasis added.) Quantum's recovery under the Agreement is not limited to "material" breaches.

As shown in the preceding point, there is substantial record evidence from which a fact finder could surmise that Quantum suffered damage as a result of Gibbs' resignation.

The circuit court's grant of summary judgment also must be reversed on this facet of the case, and the cause is remanded for further proceedings on this point.

## V

Quantum lastly claims that the circuit court erred when it dismissed Quantum's rescission claim under count I because Kleinwort's fraud in the inducement renders the entire Agreement voidable. Kleinwort counters, however, that under the express and unambiguous terms of section 11.02 of the Agreement, the remedy of rescission is specifically precluded:

> "No claims may be brought or maintained against the Buyer or the Seller *** by virtue of or based upon any alleged misstatement, omission, inaccuracy in, or breach of any representation, warranty or covenant set forth or contained in this Agreement *** (other than as provided in Section 11.03 with respect to the representations and warranties contained in Article IV, Article V and Article VI above or as provided in Article VII above), except to the extent that such claim is the result of common-law fraud, intentional omission or deliberate concealment by Such Person; *provided,* that in no event will the Buyer or its successors or permitted assigns be entitled to claim or seek rescission of the purchase or sale of the Shares consummated pursuant to this Agreement, any right of rescission or rights to damages which the Buyer might otherwise have or be deemed to have being hereby expressly waived and any claims or judgments being limited accordingly."

Accordingly, Kleinwort argues, rescission, as a remedy, is squarely precluded by the language of the Agreement. Kleinwort also asserts that section 11.02 of the Agreement is not voidable on the basis of fraud because the misrepresentations and omissions regarding Gibbs' employment status occurred after the Agreement was signed on June 30, 1991.

■ Fraud occurring after the execution of a contract, but before closing, however, provides a basis for avoiding obligations under the contract where it can be shown that the fraud relates to one of the conditions for closing. See *Schwaner v. Belvidere Medical Building Partnership,* 155 Ill. App. 3d 976, 987, 508 N.E.2d 522, 529 (1987). *Cf.* *Federal Deposit,* 877 F.2d at 622. Quantum's obligation to close under the Agreement on July 31, 1991, was based upon the "material contracts" listed in the seller disclosure statement, which was in ef-

fect between the date of its Agreement and the date of the closing. Had Quantum known of Kleinwort's fraud, Quantum could have chosen to rescind its obligation to close under the Agreement. Accordingly, the Agreement as a whole is voidable, and Quantum may seek rescission.

Kleinwort also maintains that section 11.02 of the Agreement is not void as against public policy because it limits only the remedies to be sought against the intentional wrongdoer. Public policy concerns enunciated in *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 165, 510 N.E.2d 409, 415 (1986), *appeal denied*, 116 Ill. 2d 578, 515 N.E.2d 129 (1987), are applicable here. The *Zimmerman* decision is consistent with a long line of cases which holds that exculpatory clauses for wilful and wanton conduct are void as a matter of public policy. See, *e.g.*, *Davis v. Commonwealth Edison Co.*, 61 Ill. 2d 494, 500-01, 336 N.E.2d 881, 885 (1975); *Falkner v. Hinckley Parachute Center, Inc.*, 178 Ill. App. 3d 597, 604, 533 N.E.2d 941, 946 (1989); *Third Swansea Properties, Inc. v. Ockerlund Construction Co.*, 41 Ill. App. 3d 894, 897, 354 N.E.2d 148, 150 (1976).

Section 11.02, insofar as it purports to limit Kleinwort's liability for fraud under the circumstances present here, is void as against public policy and cannot be enforced so as to preclude Quantum from seeking rescission of the Agreement. Accordingly, the circuit court erred in dismissing Quantum's rescission claim.

It may be true, as Kleinwort contends, that Quantum's rescission claim is no longer viable because the real parties in interest no longer own VTC. Nevertheless, it is within the circuit court's discretion to fashion an equitable remedy of rescission if the restoration of the status quo is impossible. Here, the circuit court itself has never considered whether such relief could, or should, be granted. This is an issue to be decided by the circuit court in the first instance, after an evidentiary hearing.

For the reasons set forth above, we reverse the judgment of the circuit court, which dismissed count I of Quantum's counterclaims and which granted summary judgment to the Kleinwort parties on Quantum's counterclaims, counts II and III. The cause is remanded for further proceedings consistent with the foregoing opinion.

Reversed and remanded.

SCARIANO and DiVITO, JJ., concur.