SIXTH DIVISION
October 5, 2007

No. 1-05-4070

| | | |
|---|---|---|
| CLINTON IMPERIAL CHINA, INC., d/b/a Harris Potteries, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| LIPPERT MARKETING, LTD. and JEFFREY LIPPERT, | ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Lippert Marketing, Ltd., | ) ) | |
| Counterclaimant and Cross-Appellant; | ) ) | |
| Clinton Imperial China, Inc., d/b/a Harris Potteries, and Robert Harris, | ) ) ) | Honorable Robert E. Gordon, |
| Counterdefendants and Cross-Appellees).) | | Judge Presiding |

JUSTICE McNULTY delivered the opinion of the court:

A sales agent helped a manufacturer find a retail distributor for its products. The manufacturer agreed to pay the agent a commission on its sales to the distributor for a period of five years. As the distributor preferred to communicate directly with the manufacturer, the agent did not provide the customary services of a sales representative. After paying commissions for more than a year, the manufacturer sued the agent to recover commissions paid after the agent stopped providing services. The agent countersued for commissions on all products the distributor agreed to purchase, even those ordered after the end of the agreed five-year period. The trial court found that the failure to provide customary services did not warrant

forfeiture of commissions.  The court awarded the agent commissions promised on all products the distributor ordered from the manufacturer during the agreed five-year period.  We affirm the judgment entered against the manufacturer for those commissions.

BACKGROUND

In January 1995, Robert Harris, president of Harris Potteries (Potteries), met Jeffrey Lippert, president of Lippert Marketing (Marketing), at a trade show.  Lippert told Harris he knew of a major distributor who might want to purchase unglazed stoneware products from Potteries.  A few months later Harris and Lippert signed an agreement for Marketing to act as sales representative for Potteries.  The agreement provided that "The Pampered Chef shall be exclusively assigned to [Marketing] and may not be reassigned to another sales representative or become a house account without the express consent of Lippert."  A letter dated July 14, 1995, established Marketing's commissions at 10% of Potteries' sales to The Pampered Chef (Chef).

Chef instituted a policy of direct communication with manufacturers.  Potteries designated Lippert as the person to service Chef's account.  Chef's president called Harris and told him that Chef preferred to communicate directly with manufacturers.  Harris called Lippert and told him Potteries would accommodate Chef, so Harris would assume responsibility for contact with Chef.

1-05-4070

Partly because of Marketing's reduced role, Potteries renegotiated its contract with Marketing. In August 1995 Potteries and Marketing signed a document entitled "SALES REPRESENTATION AGREEMENT." The agreement provided:

"2. [Potteries] agrees to engage and [Marketing] agrees to supply all or some of the consulting marketing and sales services of [Marketing] as an independent agent as such services, generally available to the public, may pertain to ceramic product for sale by [Potteries] to The Pampered Chef Ltd. account.

3. [Potteries] acknowledges that [Marketing] has been the procuring agent of The Pampered Chef, Ltd., account *** and agrees to make [Marketing] the exclusive agent of said account during the term of this agreement. A copy of the July 5, 1995 AGREEMENT BETWEEN HARRIS POTTERIES AND THE PAMPERED CHEF, LTD., of which [Marketing] initiated and consulted on [Potteries'] behalf, is attached hereto and incorporated by reference herein. ***

***

5. For and in consideration of [Marketing's] procuring The Pampered Chef, Ltd. account for [Potteries] and rendering consulting marketing and sales expertise to [Potteries, Potteries] will pay compensation to [Marketing] as a percent of [Potteries'] annual

-3-

collected sales (including sales up to December 31, 2000 but collected afterwards) to The Pampered Chef, Ltd. as follows[:]

        from January 1, 1996, to December 31, 2000,
        $0 to $20,000,000 of sales        5%
        20,000,001 to 30,000,000 of sales  2%
        over 30,000,000                    1%

6.   [Marketing] will be paid on paid invoices of all orders placed by The Pampered Chef, Ltd.  [Potteries] will pay said commissions to [Marketing] by the end of the month following the month during which payment is received by [Potteries]. ***

                        *  *  *

11.   This agreement shall terminate on December 31, 2000.  [Potteries] may sell to The Pampered Chef, Ltd. after the expiration of this agreement on December 31, 2000 without any further compensation being paid to [Marketing]."

The July 5 agreement between Potteries and Chef, referenced in Potteries' agreement with Marketing, provided:

    "[Chef] agrees to buy from [Potteries], and [Potteries] agrees to make and sell to [Chef], a minimum of 700,000 pieces in total during each of the calendar years 1996 through 2000."

In December 1995 Chef sent Potteries a proposed amendment to

the July 5 agreement.  According to the proposal, Chef would purchase a minimum of 3.5 million pieces each year from 1997 through 2000.  In January 1996 Potteries and Marketing amended their August 1995 agreement by adding a limitation on Marketing's right to represent competitors of Potteries.  But the amendment allowed specific relief:

> "If, however, [Potteries] is unable to manufactur[e] sufficient quantities to meet at least 70% of the requirements of The Pampered Chef, Ltd., as detailed in the Agreement Between Harris Potteries and The Pampered Chef, Ltd. dated 7/5/95 and any addendums *** which has to date been amended stating the minimum required quantity is 3,500,000 pieces per calendar year beginning with 1997, then *** [Marketing] will be permitted to seek or solicit, or cause others to seek or solicit other vendors or manufacturers to supply unglazed stoneware to The Pampered Chef, Ltd."

In March 1996 Harris signed an amendment to Potteries' agreements with Chef, but this amendment called for a minimum of only 2 million pieces of unglazed stoneware per year, rather than the 3.5 million pieces Chef initially proposed.  In 1997 Chef and Potteries signed a further amendment in which Chef and Potteries agreed that, because of decreased demand for Potteries' products, Chef would decrease its annual purchases, but it would extend the term of the agreement to reach the same sales total of 8 million

pieces. Chef promised to purchase about 1 million pieces per year, but it would continue purchasing from Potteries at that rate at least through 2004.

Potteries paid commissions to Marketing on its sales to Chef each month. Despite the reduction in amounts sold, Marketing never exercised its right to contact manufacturers of products that competed with Potteries' products.

In 1995 Lippert secretly recorded a conversation he had with an officer of Chef. When Chef found out about the recording, it sent Lippert a letter informing him that he would "no longer be allowed on the premises" of Chef. Marketing then sued Chef for tortious interference with Marketing's relationship with Potteries.

In 1998 Potteries sent Marketing a fax asking Marketing to recommend a manufacturer for soup tureens Chef sought. Marketing responded that it knew a manufacturer and would work with Potteries on the project if Potteries would sign a new agreement for Marketing to act as Potteries' sales representative. Potteries replied that in their contract Marketing promised to provide ongoing services. If Marketing refused to provide such services, Potteries should not have any duty to pay commissions to Marketing. Potteries last paid Marketing a commission for April 1998.

In July 1998 Potteries sued Marketing for breach of contract. Potteries sought to recoup amounts it paid Marketing

as commissions after Marketing stopped providing customary services expected from sales representatives. Marketing countersued for breach of contract, fraud, and violation of the Sales Representative Act (820 ILCS 120/0.01 et seq. (West 1998)). In the fraud count, Marketing alleged that Harris, as an officer of Potteries, falsely represented that Chef agreed to purchase 3.5 million pieces from Potteries each year. In reliance on that misinformation, Marketing signed the amendment dated January 1996, limiting its right to represent Potteries' competitors. Marketing sought relief both from Potteries and from Harris individually in the fraud count. Only the fraud count included any request for relief from Harris personally.

The parties moved for summary judgment on both the complaint and the counterclaim. Potteries supported its motion with the deposition of Harris, who swore that since July 1995 he provided 100% of sales representative services to Chef. Harris described at length the services he expected from sales representatives and he swore that Marketing could have provided some of those services despite Chef's request for direct communication with Potteries. Potteries also presented the deposition of Lippert, who admitted that he did not try to contact any of Potteries' competitors after he discovered that Potteries would not make 70% of the 3.5 million pieces promised in the January 1996 agreement.

The court denied most of the motions, but it granted Potteries summary judgment on the fraud count of Marketing's

counterclaim. For purposes of the motion, the court assumed that the misrepresentation concerning the quantity of assured sales induced Marketing to sign the January 1996 amendment restricting its right to represent Potteries' competitors. The court found:

"The January 10, 1996 addendum, however, did not guarantee [Marketing] a certain amount of commissions. It merely stated that [Potteries] had a current agreement with [Chef] for a minimum of 3.5 million pieces a year and that if [Potteries] was unable to manufacture 70% of that amount *** [Marketing] would be free to solicit other vendors. Jeffrey Lippert testified that when he learned that [Potteries] was not going to manufacture 70[%] of the 3.5 million he chose not to solicit any other vendors. ***

Any damages sustained by the false statement would be business opportunities lost by [Marketing] as a result of being induced to enter into the January 10, 1996 agreement. [Marketing] has not alleged any such damages. Summary judgment is appropriate."

At trial the parties agreed on Potteries' total orders from Chef through December 2000 and through December 2004. The parties presented conflicting evidence on the extent of the services Marketing could provide Potteries for sales to Chef after Chef expressed its preference for communicating directly with Potteries. Potteries contended that it owed no commissions

after Marketing breached the sales service contract by taping a conversation with Chef and by suing Chef. The parties also presented extensive evidence concerning the negotiations that led to their contracts. The court allowed the testimony as parol evidence concerning the meaning of the several contracts at issue.

In its order disposing of the case, the court said:

"Lippert's wrongful and inappropriate taping episode and lawsuit against *** Chef did not affect or impair any of [Potteries'] sales to *** Chef; in fact, they increased substantially to such an extent that [Potteries] had to seek a larger facility and their entire manufactured output was purchased by *** Chef. ***

* * *

*** [Potteries] initially entered into the contract with [Marketing] in July of 1995 to obtain *** Chef as a customer. ***

*** [Marketing] was supplying all of the consulting, marketing and sales services pertaining to the ceramic products for sale to *** Chef. The benefit [Potteries] desired was the business of *** Chef and they did not lose that benefit under the August agreement. *** [T]hey executed the August agreement with full knowledge that [Marketing] would have little

or no involvement with the *** Chef account. ***

[Potteries] offered no evidence in this case of any damages that they sustained as a result of [Marketing's] failure to provide the services that they claim. They ask for the return of commissions paid, but have shown no evidence of out of pocket or other compensatory damages as a result of Lippert's inappropriate and wrongful taping of the conversation with an employee of *** Chef which caused Lippert to be barred from their premises. ***

If this court would find that [Marketing's] failure to perform services was a material part of the contract[, Marketing] would have to forfeit the commissions that were owed to [it] and the commissions [it] received after [Lippert] was barred from *** Chef's premises. As a result, the party failing to perform would suffer a great forfeiture under the facts and circumstances of this case.

*** There is no excuse for [Lippert's] behavior. ***

        ***

*** [Marketing's] breach was a minor breach of the contract not a material breach that would discharge [Potteries] from paying commissions."
The court awarded Marketing a 5% commission on all orders

Potteries received by December 31, 2000, but it denied

Marketing's request for commissions on all 8 million pieces sold

to Chef by December 31, 2004, under the 1997 amendment to the

agreement of July 5, 1995, between Potteries and Chef.  The court

also denied the claim under the Sales Representative Act.  The

court held:

> "[T]here was no evidence of willful/wanton conduct
>
> on the part of [Potteries].  But more importantly[,]
>
> *** [Marketing] was not a sales representative for
>
> [Potteries] on the *** Chef account once *** Chef
>
> refused to accept [Lippert] as [Potteries']
>
> representative and barred him from their premises as a
>
> result of Lippert's wrongful conduct.  *** The
>
> commissions in this case accrued after [Marketing]
>
> ceased being a[n] active sales representative."

The court awarded Marketing a judgment against Potteries and

Harris in the amount of $1,290,790.90, as the 5% commission due

on sales from April 1998, when Potteries stopped paying

commissions, through December 2000.

In a petition for rehearing, Potteries claimed that the

court had analyzed the case improperly, without reference to

Marketing's duties as Potteries' agent.  Marketing also

petitioned for modification of the order.  The trial court held:

> "Lippert's actions *** were not a material violation
>
> and *** the conduct of Lippert was not deliberate or

-11-

willful, even though the taping was wrong and illegal. *** [T]he law of Agency does not bar recovery upon such evidence ***. *** [T]here was no willful or deliberate act by Lippert that would cause harm to the principal."

The court denied the motions for reconsideration and for modification of the judgment. Potteries and Harris appeal and Marketing cross-appeals.

ANALYSIS

Potteries argues first that Marketing breached the August 1995 contract by covertly taping a conversation with an officer of Chef, by suing Chef, and by failing to provide services Potteries requested in 1998. Our supreme court established the applicable principles:

"[W]hen one breaches a fiduciary duty to a principal the appropriate remedy is within the equitable discretion of the court. While the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy [citation], such will not always be the case. Punitive damages are *permissible* where a duty based on a relationship of trust is violated, the fraud is gross, or malice or willfulness is shown; such an award is not automatic." (Emphasis in original.) In re Marriage of Pagano, 154 Ill. 2d 174, 190 (1992).

When an agent acts in willful or deliberate breach of the

fiduciary duty of loyalty to the principal, the agent "could not expect compensation *** for the period of time in which the agent was disloyal." R.K. Ray Sales, Inc. v. Genova, Inc., 133 Ill. App. 3d 98, 102 (1985). In deciding whether the agent has forfeited its right to compensation, the court may consider "the seriousness and timing of the violation; the willfulness of the breach; the potential for, or actual harm to the principal; and whether the agent completed a divisible portion of his contract duties before the breach occurred for which compensation can be determined." Rockefeller v. Grabow, 136 Idaho 637, 643, 39 P.3d 577, 583 (2001).

Here, Marketing provided essentially no services after July 1995, largely because Chef wanted no such services, and not due to disloyalty to Potteries. Suing Chef and taping the conversation probably offended Chef, but Chef apparently did not hold the offense against Potteries, whose sales to Chef rose sharply after the incidents. Moreover, no evidence indicates that Lippert acted from a motive of disloyalty to Potteries when he recorded the conversation and sued Chef. The trial court found that Lippert acted solely to protect his interests as a sales agent and not in derogation of any interest of Potteries. Before the breaches, Marketing had already performed the most essential part of its duties by bringing Potteries and Chef together. Under these circumstances the trial court found insufficient grounds for forfeiture. We cannot say that the

1-05-4070

trial court abused its discretion.

Next, Potteries argues that the court misconstrued the contract and therefore miscalculated the amount due. Because the court heard evidence concerning the meaning of the contract provisions, we will overturn the findings of fact only if they are contrary to the manifest weight of the evidence. Marathon Plastics, Inc. v. International Insurance Co., 161 Ill. App. 3d 452, 459-60 (1987). The court awarded Marketing a 5% commission on all sales to Chef made between April 1998 and December 2000, even though the total sales in that period exceeded $25 million. Potteries argues that the court should have awarded Marketing only 2% of the sales in excess of $20 million. Marketing answers that the court should have awarded it 5% of all sales through December 2004, because Chef in 1997 agreed to purchase 8 million units, and it did not complete the purchase until December 2004.

The contract provides:

"[Potteries] will pay compensation to [Marketing] as a
percent of [Potteries'] annual collected sales
(including sales up to December 31, 2000 but collected
afterwards) to The Pampered Chef, Ltd. as follows.

from January 1, 1996, to December 31, 2000,
$0 to $20,000,000 of sales          5%
20,000,001 to 30,000,000 of sales  2%
over 30,000,000                    1%."

We must construe the contract as a whole, giving effect to all

-14-

1-05-4070

its terms. First Bank & Trust Co. of Illinois v. Village of Orland Hills, 338 Ill. App. 3d 35, 40 (2003).

The court awarded Marketing 5% of the total sales because the sales for each calendar year from 1996 through 2000 never exceeded $20 million. Marketing argued, and the trial court held, that commissions would fall to 2% under the contract only if Potteries sold more than $20 million worth of goods to Chef in a single calendar year. We agree with the trial court's interpretation of the contract. The contract requires payment of a 5% commission on "annual collected sales" up to $20 million. The specification of the contract's duration, from January 1, 1996, through December 31, 2000, simply establishes the five years for which Potteries must pay the 5% commission.

Marketing, on the cross-appeal, claims that Potteries owes it commissions for all of the 8 million pieces eventually sold, because Chef promised, in the amendment Potteries and Chef signed in 1997, to purchase the 8 million pieces, and therefore Marketing qualifies as the procuring cause for the orders for all 8 million pieces. See Solo Sales, Inc. v. North America OMCG, Inc., 299 Ill. App. 3d 850, 852 (1998); Technical Representatives, Inc. v. Richardson-Merrell, Inc., 107 Ill. App. 3d 830, 833 (1982). However, the rule requiring commission payment to the procuring cause of a sale does not apply when a contract expressly governs the terms for payments and the contract's duration. See Solo Sales, 299 Ill. App. 3d at 852;

-15-

1-05-4070

Technical Representatives, 107 Ill. App. 3d at 833. The contract here establishes explicit terms for its termination with payment for pieces sold by December 31, 2000, even if Potteries collected payments thereafter. The court awarded Marketing commissions on all pieces Chef ordered by December 31, 2000.

If we accept Marketing's interpretation of the contracts and find that Potteries sold all 8 million pieces, within the meaning of its contract with Marketing, at the time it signed the 1997 amendment to its agreement with Chef, then the court should have counted all of the sales in 1997's annual collected sales, and therefore it should have awarded only 2% commissions on sales in excess of $20 million. That is, Marketing's claim for commissions on all 8 million pieces conflicts with its own claim for 5% commissions on all the sales because sales never exceeded $20 million in any calendar year.

We agree with the trial court's construction of the contract. Potteries sold the pieces, for purposes of establishing Marketing's right to a commission, only when Chef ordered the pieces. Chef had not ordered all 8 million pieces by December 31, 2000. Under the explicit terms of the contract, Potteries owed Marketing commissions only on the pieces ordered by that date.

Next Marketing argues that the court should have awarded it attorneys fees and punitive damages on the claim under the Sales Representative Act. That act defines a sales representative as

-16-

"a person who contracts with a principal to solicit orders and who is compensated *** by commission." 820 ILCS 120/1(4) (West 1998). Before Marketing entered the August 1995 contract at issue here, Chef had already informed Potteries that it would contact Potteries directly, rather than Marketing, for orders and service. Thus, at the time of the contract at issue, Marketing had no responsibility for soliciting orders. Under the definition in the Sales Representative Act, Marketing did not qualify as a sales representative. The court correctly entered judgment in favor of Potteries on the claim under the Sales Representative Act.

Finally, Marketing asks us to reverse the summary judgment entered on the fraud count. We review the issue *de novo*. Delaney v. McDonald's Corp., 158 Ill. 2d 465, 467 (1994). To establish a cause of action for fraud, Marketing must show that Potteries intended to induce Marketing to act when Potteries made a false statement of material fact, and Marketing's reasonable reliance on the statement caused it to suffer damages. Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 496 (1996). Marketing presented evidence that Harris falsely told Marketing that Potteries had a contract with Chef for 3.5 million pieces per year for four years. Marketing also presented evidence that could support a finding that Marketing reasonably relied on that statement when it signed the document in which it agreed not to represent Potteries' competitors. However, the agreement imposed

no limit at all on Marketing if Potteries failed to sell Chef 70% of the 3.5 million promised pieces.  Thus, when Potteries failed to sell that amount, Marketing could freely represent any of Potteries' competitors without breaching the agreement.  Marketing's decision, independent of the agreement, not to contact any such competitors cannot create compensable damages.

Cases in which courts have awarded parties damages measured by the benefit of the bargain do not conflict with the trial court's decision here.  See Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc., 285 Ill. App. 3d 201 (1996); Four "S" Alliance, Inc. v. American National Bank & Trust Co. of Chicago, 104 Ill. App. 3d 636 (1982).  In those cases the plaintiffs spent substantial sums of money in reliance on the defendants' false representations.  Because Marketing here gave up nothing in reliance on the alleged false representation, it suffered no recoverable damages.  See Geske v. Geske, 343 Ill. App. 3d 881, 886 (2003).  The trial court correctly granted Potteries and Harris summary judgment on the fraud count.

Marketing sought a judgment against Harris personally only in the fraud count, and the trial court had granted Harris summary judgment on that count before trial.  Thus, the trial court faced no claim against Harris personally when it entered the judgment against Potteries and Harris.  Accordingly, we reverse the judgment insofar as the court entered it against Harris personally.  See Hoopingarner v. Peric, 28 Ill. App. 3d

1-05-4070

53, 57 (1975).

Although Marketing did not fully comply with its promises in its contract with Potteries, the trial court did not abuse its discretion when it decided that the breaches did not require forfeiture of Marketing's commissions. Because Potteries' "annual collected sales" never exceeded $20 million, the contract required payment of a 5% commission on all items Chef ordered from Potteries by December 31, 2000. The express terms of the contract give Marketing no right to commissions on pieces ordered thereafter. Marketing no longer acted as a sales representative to Chef, within the meaning of the Sales Representative Act, after Chef specified that it would order items directly from Potteries without Marketing's intervention. Because Marketing did not give up anything in reliance on Potteries' alleged statements, the trial court correctly entered judgment in favor of Harris and Potteries on the fraud count of Marketing's counterclaim. As Marketing did not seek a judgment against Harris in any other count of the counterclaim, we reverse the judgment entered against Harris. In all other respects, we affirm the judgment of the trial court.

Affirmed in part and reversed in part.

O'MALLEY and O'MARA FROSSARD, JJ., concur.

-19-