VALERIO FRIGO *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. MOTORS INSURANCE CORPORATION, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)    No. 1—93—4551

Opinion filed February 28, 1995.

O'Brien, Hanrahan, Wojcik & Fay, of Chicago (Daniel E. Murphy, of counsel), for appellant.

Joseph A. Terc, of Chicago, for appellees.

JUSTICE DiVITO delivered the opinion of the court:

This action was brought to seek stacked medical payments coverage and underinsured motorist coverage under an insurance policy sold by defendant Motors Insurance Corporation (Motors) to plaintiffs Valerio Frigo and Isabella Frigo (the Frigos). The circuit court entered summary judgment for the Frigos, finding that the insurance policy was ambiguous. The court denied Motors' amended motion for summary judgment, including a counterclaim in the alternative for reformation of the insurance policy. Prior to completion of the briefing schedule on the cross-motions for summary judgment, Motors brought an amended motion to reopen discovery and the court denied the motion. Motors appeals from the grant of summary judgment to the Frigos, the denial of its motion for summary judgment, and the denial of its motion to reopen discovery. The circuit court granted Motors a stay pending appeal, and the Frigos cross-appeal the granting of the stay. For reasons that follow, we reverse the granting of

summary judgment to the Frigos and the denial of summary judgment to Motors, and enter summary judgment for Motors, rendering the other issues moot.

The Frigos filed their complaint for a declaratory judgment on April 26, 1990. The case had been begun in 1987, but was dismissed for want of prosecution and refiled pursuant to section 13—217 of the Illinois Code of Civil Procedure (735 ILCS 5/13—217 (West 1992)). The Frigos alleged that they were insured by Motors; that Isabella Frigo had been injured in a covered automobile accident on December 31, 1986; that the insurance company of the driver of the other automobile had paid her a total of $15,000 in settlement of her claims; that Motors had paid her $5,000 under her medical payment coverage and $35,000 under her underinsured motorist coverage; and that she was insured under three policies for a total of $15,000 under medical payment coverage and $150,000 under underinsured motorist coverage. The Frigos requested a declaration of rights and a declaratory judgment that they were entitled to an additional $10,000 under their medical payment coverage under a theory called "stacking" (the piling up of benefits from different insurance policies or from different automobiles insured under the same policy) because the portions of the policy limiting their recovery are void as contrary to public policy, and that they are due an additional $100,000 under their underinsured motorist coverage under the same theory. They believed they were entitled to stack these coverages because of ambiguities in the policy as it existed on the day of the accident.

Motors filed its answer and affirmative defense to the complaint on July 10, 1990, alleging the existence of only one policy covering three separate automobiles. It asked the court to declare that stacking is impermissible in this case and that its liability under the policy was limited to the $40,000 it had already paid to the Frigos.

Discovery began on December 3, 1990, and continued until July 31, 1991. The record contains the Frigos' answers to interrogatories; the deposition of Valerio Frigo; the deposition of Isabella Frigo; the affidavit of Shelvie Faust, branch manager of Motors; the affidavit of Isabella Frigo; the affidavit of Valerio Frigo; the affidavit of Daniel E. Murphy, Motors' attorney; and the insurance policy.

The Frigos had made a written application for automobile insurance with Motors on April 26, 1986, when they purchased a new 1986 Chevrolet Nova. At the time, they resided in Dolton, Illinois. The application was signed by Isabella Frigo. It sets bodily injury and property damage coverage limits of $50,000/$100,000/$25,000, with uninsured and underinsured motorist coverage in equal amounts.

On the day of their application, Motors issued one policy of insurance covering three of the Frigos' motor vehicles: two 1986 Chevrolet Novas and one 1982 Buick Skylark. The Frigos were provided with the insurance policy documents, read them when they received them, and understood that the policy provided $50,000 in underinsured motorist coverage in April 1986. They also understood that at that time the policy provided $5,000 in medical payment coverage.

On or about June 5, 1986, Motors issued a declaration sheet reflecting the coverages provided to the Frigos pursuant to their April 1986 application for insurance. The Frigos received a copy and in fact produced a copy through discovery. The declaration sheet provided for $50,000 for each person and $100,000 for each accident in underinsured motorist coverage, and $5,000 for each person in medical payments coverage. The declaration sheet further stated that endorsements PP0001, PP0311, and PP0402, among others, comprised the Motors insurance policy issued to the Frigos.

Endorsement PP0001 provided for medical payments coverage, in pertinent part, as follows:

"LIMIT OF LIABILITY

The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for each person injured in any one accident. This is the most we will pay regardless of the number of:

1. 'Insureds';
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident.

\* \* \*

OTHER INSURANCE

If there is other applicable auto medical payments insurance we will pay only our share of the loss. Our share is the proration that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible auto insurance providing payments for medical or funeral expenses."

The declaration sheet also stated the following:

"UNDERINSURED MOTORIST COVERAGE

$50,000 each person/$100,000 each accident."

Endorsement PP0311 of the policy provided, in pertinent part, as follows:

"LIMIT OF LIABILITY

The limit of liability shown in the Schedule for this coverage is our maximum limit of liability for all damages, resulting from any one accident. This is the most we will pay regardless of the number of:

1. Covered persons;
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident."

Endorsement PP0402 of the policy provided, in pertinent part, as follows:

"The first paragraph of the Limit of Liability provision in the Underinsured Motorists Coverage Endorsement is replaced by the following:

LIMIT OF LIABILITY

The limit of liability shown in the Schedule or in the Declarations for each person for Underinsured Motorist Coverage is our maximum limit of liability for all damages for care, loss of services or death, arising out of 'bodily injury' sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Schedule or in the Declarations for each accident for Underinsured Motorist Coverage is our maximum limit of liability for all damages for 'bodily injury' resulting from any one accident. This is the most we will pay regardless of the number of:

1. 'Insureds';
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident."

The policy also contains the following language in the "General Provisions" section:

"CHANGES

This policy contains all the agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us. If a change requires a premium adjustment, we will adjust the premium as of the effective date of change.

We may revise this policy form to provide more coverage without additional premium charge. If we do this your policy will automatically provide the additional coverage as of the date the revision is effective in your state."

On August 20, 1986, the Frigos moved to Lockport, Illinois. They notified Motors of their new address, but did not request any changes in their coverage and understood that the address change would not affect their coverage. Motors' agent filled out a policy change request form in order to amend the Frigos' address as requested; no other change was requested by the agent in the policy change request form. Motors' "Auto Daily Activity Listing" reflects that an amended declaration sheet was issued and that no increased or decreased premium was to be charged to the Frigos for the amendment to their policy to change their address.

The amended declaration sheet states that endorsements PP0001 and PP0402, among others, comprised the Motors policy issued to the Frigos, and further states underinsured motorist ($50,000/$100,000) and medical payments ($5,000) policy limits identical to those in the initial declaration sheet. Endorsement PP0311, however, was not listed on the amended declaration sheet as part of the policy, as it had been on the initial declaration sheet. At the time Motors issued the amended declaration sheet in response to the request for an address change, it did not intend to delete or omit endorsement PP0311 from the amended declaration sheet. The Frigos did not notice or discover the omission of endorsement PP0311 from the amended declaration sheet until their attorney noticed it when he received the policy from the Frigos after the automobile accident that occurred on December 31, 1986.

On that date, Isabella Frigo was operating a vehicle covered by the Motors policy when she was involved in an accident with a vehicle driven by William Redell, who was insured with another company to the extent of $15,000. That company paid Isabella Frigo its policy limits of $15,000 in settlement of the claim against Redell.

Motors initially denied coverage as to any claim arising from the accident with Redell, but after the initial filing of suit in 1987 paid the underinsurance coverage ($35,000) and the medical payments coverage ($5,000) for the vehicle that Isabella Frigo was driving at the time of the accident. Motors claimed a credit of $15,000, representing the Redell settlement, against what Motors claims is the Frigos' underinsured policy limit of $50,000. The Frigos agree that Motors is "entitled to a credit of *** $15,000" for that settlement.

The Frigos moved for summary judgment on September 5, 1991. They filed their amended complaint for declaratory judgment on September 25, 1991, changing only their allegation that Motors had issued three policies to an allegation that Motors had issued one policy covering three vehicles. Motors filed its answer, affirmative defenses, and counterclaims on September 25 as well.

As its first affirmative defense, Motors alleged that the limits of liability under its policy are clear and unambiguous because of endorsement PP0311, and that the Frigos are entitled to no more than the $40,000 they have already received. As its second affirmative defense, Motors alleged that the omission of endorsement PP0311 from the amended declaration was a mutual mistake of fact and requested the court to reform the contract of insurance to include it. As its third affirmative defense, Motors alleged that the omission of endorsement PP0311 was a unilateral mistake of fact and requested the court to reform the contract of insurance to include it.

In count I of the counterclaim Motors realleged mutual mistake of fact, and in count II of the counterclaim Motors realleged unilateral mistake of fact. It sought the reformation of the instrument to include endorsement PP0311 and any other relief the court might find just and equitable.

The Frigos moved to strike Motors' affirmative defenses and counterclaim on October 11, 1991, and the circuit court struck the second and third affirmative defenses and count II of its counterclaim, on January 7, 1992. The Frigos then answered the remaining affirmative defense and count I of the counterclaim, both dealing with mutual mistake of fact, on January 27, 1992. Motors filed its amended motion for summary judgment and a memorandum in support on February 5, 1992.

On March 27, 1992, Motors filed an amended motion for a reopening of discovery in order to determine when, if ever, the Frigos noticed or discovered that endorsement PP0311 was omitted from the amended declaration sheet. Following argument, the circuit court denied the motion on November 2, 1992.

Following argument on the cross-motions for summary judgment on September 22, 1993, the circuit court took the matter under advisement. On November 23, 1993, the court granted the Frigos' motion for summary judgment, denied Motors' motion for summary judgment, and denied Motors' motion for reformation of the contract of insurance due to mutual mistake, the remaining counterclaim. The court added that it found "no just reason to delay enforcement or appeal."

Motors filed a timely notice of appeal on December 21, 1993. On the same day, Motors filed an emergency motion for a stay pending appeal, pursuant to Supreme Court Rules 305(b) and (h) (134 Ill. 2d Rules 305(b), (h)). The circuit court granted the motion, provided that Motors file a certified copy of the insurance policy to be considered as bond within seven days. Motors filed the required certified copy on December 27, 1993.

On December 30, 1993, the Frigos filed a copy of their emergency motion to modify the stay, which had been denied on December 28, 1993. The motion had requested that if Motors is unsuccessful in its appeal, they be awarded interest on any subsequent award at arbitration at the rate of 9%. The Frigos filed their timely notice of cross-appeal of the circuit court's orders of December 21, 1993, and December 28, 1993, on December 30, 1993.

Summary judgment is appropriate when the pleadings and proofs present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. (735 ILCS 5/2—1005 (West

1992); *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240-41, 489 N.E.2d 867, 871.) The use of summary judgment is encouraged in Illinois as an aid to the expeditious disposition of lawsuits. (*Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) The standard of review in summary judgment cases is *de novo*; this court may not defer to the judgment of the circuit court. (*South Suburban Safeway Lines, Inc. v. Regional Transportation Authority* (1988), 166 Ill. App. 3d 361, 519 N.E.2d 1005, *appeal denied* (1988), 122 Ill. 2d 594, 530 N.E.2d 265.) In reviewing a grant of summary judgment, the appellate court considers anew the facts and law related to the case and determines whether the circuit court was correct in its ruling. *Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 824, 585 N.E.2d 1164, 1167.

I

Motors first asserts that summary judgment on the stacking of medical payment coverages was inappropriate. It argues that, rather than being ambiguous as the circuit court found, the language of the contract of insurance regarding the stacking of medical payment coverages included in endorsement PP0001 was clear, concise, and unambiguous. The Frigos respond that they requested the circuit court to find the language of endorsement PP0001 void as against public policy, and that the circuit court obviously agreed with them.

■ The issue here is whether the "Limit of Liability" clause, together with the declaration sheet and the amended declaration sheet, was clear and unambiguous. If the clause is ambiguous, the policy must be construed in favor of the Frigos. (*Bailey v. Auto-Owners Insurance Co.* (1992), 229 Ill. App. 3d 514, 516, 592 N.E.2d 1133, 1134.) If it is unambiguous, there is no need for construction and the clause may be applied as written, unless it contravenes public policy. (*Menke v. Country Mutual Insurance Co.* (1980), 78 Ill. 2d 420, 423, 401 N.E.2d 539, 541.) An insurance policy is considered ambiguous if it is subject to more than one interpretation. *Allstate Insurance Co. v. Gonzalez-Loya* (1992), 226 Ill. App. 3d 446, 449, 589 N.E.2d 882, 885.

The Illinois Appellate Court's decision in *Phillips v. Inter-Insurance Exchange of the Chicago Motor Club* (1980), 91 Ill. App. 3d 198, 414 N.E.2d 226, is directly on point. In *Phillips*, the plaintiff owned six automobiles, which were insured by the same insurance company under two separate policies (each covering three vehicles, as is the case here). The plaintiff in *Phillips* paid separate premiums for medical payments coverage for each automobile, as did the Frigos here. The operative clause in the insurance contract at issue was as follows:

" 'Insurance is granted with respect to each vehicle described herein as a separate risk, each with only the coverages, limits of liability and premiums specified herein for such particular vehicle.

\* \* \*

PART II—Expenses for Medical Services—Coverage C, Limit of Liability. The limit of liability for medical payments stated in the Declarations as applicable to 'each person' is the limit of the Exchange's liability for all expenses incurred by or on behalf of each person who sustained bodily injury as a result of any one accident.' " *Phillips*, 91 Ill. App. 3d at 200, 414 N.E.2d at 228.

The *Phillips* court did not allow stacking of the three separate medical payments coverages covering three separate automobiles under one policy. In so holding, the court stated:

"The present case involves medical benefit coverage which is not required by law. Plaintiff here was not paying premiums for something he was already receiving. Under his policy, if he was riding in an automobile owned by him but not specifically insured under the policy, and he was injured, he would not be eligible to receive benefits under the policy. \*\*\* Here, the clear statement of the two quoted provisions was that coverage of each vehicle was a separate risk and the limit of liability stated as to a person was the limit of liability of defendant to that person. Each policy unambiguously prohibited stacking of medical payment limits within the policy." *Phillips*, 91 Ill. App. 3d at 201, 414 N.E.2d at 228.

In *Sharples v. General Casualty Co.* (1980), 85 Ill. App. 3d 899, 407 N.E.2d 674, this court held that the clear and unambiguous insurance policy language prohibited the stacking of uninsured motorist coverage for two automobiles which were covered by one policy of insurance issued by the defendant.

■ As cited above, endorsement PP0001 clearly prohibits the stacking of medical payments coverage. Only one limit of liability is shown in the declarations and the amended declarations for medical payments coverage, and that amount is clearly expressed as the maximum limit of liability for each person injured in any one accident regardless of the number of insureds, claims made, vehicles, or premiums shown in the declarations or vehicles involved in the accident. The record makes clear, and the Frigos admit, that endorsement PP0001 was part of their policy at the time of the accident. Unless the limits of liability clause contravenes public policy, then, it is effective.

The Frigos requested a determination from the circuit court that subparagraphs B and C of endorsement PP0001 are contrary to public policy. These paragraphs read as follows:

"LIMITS OF LIABILITY

\* \* \*

B. Any amounts otherwise payable for expenses under this coverage shall be reduced by any amounts paid or payable for the same expenses under Part A or Part C.

C. No payment will be made unless the injured person or that person's legal representative agrees in writing that any payment shall be applied toward any settlement or judgment that person receives under Part A or Part C."

Part A of the policy concerns liability coverage, and part C concerns uninsured motorist coverage. The Frigos have not sought either liability coverage or uninsured motorist coverage, and Motors has not sought to reduce its payment of medical payments benefits by either of those coverages or even by amounts paid to the Frigos as underinsured motorist coverage. The only reduction made to the underinsured policy limits by Motors was for the $15,000 settlement the Frigos made with the adverse driver and his insurance company.

The Frigos argue that the effect of allowing this type of deduction or credit is to reduce the amount the policyholder receives below the level of coverage contracted for, and places the policyholder in a position where he or she will receive less than the statute requires when the deduction or credit is made. This is particularly true, they assert, where, as here, the damages that the insured suffered far exceed the available coverage. The Frigos cite *Glidden v. Farmers Automobile Insurance Association* (1974), 57 Ill. 2d 330, 312 N.E.2d 247, for the proposition that a plaintiff is entitled to recover under multiple policies when the plaintiff pays the premium for all of the coverages.

The Frigos ignore the fact, however, that *Phillips* distinguishes *Glidden* at great length. First, *Glidden* involved an "other insurance" clause. Second, the plaintiff in *Glidden* sought to stack between separate insurance policies. (*Phillips*, 91 Ill. App. 3d at 199, 414 N.E.2d at 227.) Accordingly, *Glidden* does not support stacking here. As the appellate court stated in *Otto v. Allstate Insurance Co.* (1971), 2 Ill. App. 3d 58, 275 N.E.2d 766, issues of coverage raised because of multiple vehicles insured under a single policy are best decided without regard to multiple coverage cases with more than one policy in question.

The Frigos further cite *Melson v. Illinois National Insurance Co.* (1971), 1 Ill. App. 3d 1025, 274 N.E.2d 664, and *Glidden* for the proposition that subparagraphs B and C of the limits of liability clause of endorsement PP0001 relating to medical payments coverage are contrary to public policy because their damages exceed the available coverage. If so, the Frigos argue, the elimination of them makes the

remaining policy language ambiguous and therefore amenable to stacking.

Even assuming the validity of the Frigos' argument on this point, the elimination of subparagraphs B and C from endorsement PP0001 would still leave subparagraph A, which prohibits stacking in clear and unambiguous language.

The circuit court's granting of summary judgment to the Frigos on the stacking of medical payments issue, as well as its denial of summary judgment to Motors on this issue, was therefore error which must be reversed. The extent of Motors' liability regarding medical payments is the $5,000 it has already paid. We therefore reverse both judgments of the circuit court and enter summary judgment on this issue in favor of Motors.

## II

Motors next asserts that the circuit court erred in granting summary judgment to the Frigos allowing them to stack underinsured motorist coverages. It argues that even though the amended declaration sheet failed to list endorsement PP0311, as the original did, the presence of endorsement PP0402 on the amended declaration sheet prohibited stacking. The Frigos respond that because endorsement PP0311 was not listed on the amended declaration sheet, endorsement PP0402 was by inference eliminated as well because its first line stated that it amended endorsement PP0311. Alternatively, they argue that the policy of insurance was ambiguous because endorsement PP0402 attempted to amend an endorsement that was not part of the policy. They further argue that the elimination of endorsement PP0311 represented a unilateral increase in coverage (that is, permitting stacking of coverages) at no increase in premium, as is allowed under the general provisions of the contract.

As cited above, endorsement PP0402 provides that "[t]he first paragraph of the Limit of Liability provision in the Underinsured Motorist Coverage Endorsement[, endorsement 0311,] is replaced by the following: ***." The endorsement then goes on to specify that coverages may not be stacked, as did endorsement PP0311, with more specific language. The anti-stacking language of endorsement PP0402 is as clear and unambiguous as the language of endorsement PP0001, and anyone reading it understands immediately that it prohibits stacking of underinsured motorists' coverage just as he or she understands that endorsement PP0001 prohibits stacking of medical payments coverages.

Endorsement PP0311 contained much more than just the anti-stacking language, however. It is the endorsement providing underin-

sured motorist coverage; endorsement PP0402 merely modifies the anti-stacking language. If endorsement PP0311 is not part of the contract of insurance, the contract contains no underinsured motorist coverage.

It is undisputed, however, that the parties originally agreed upon a contract containing underinsured motorist coverage in the amount of $50,000 per vehicle for each of three vehicles. The application for insurance verifies this fact, as does the original declaration sheet and even the amended declaration sheet. The Frigos paid premiums for underinsured motorist coverage. Both they and Motors agree that underinsured motorist coverage is somehow a part of the contract of insurance, because the Frigos made and Motors paid on a claim for underinsured motorist coverage. The simple and obvious conclusion is that the contract of insurance contains underinsured motorist coverage.

There is only one way that the contract can contain such coverage, however. Endorsement PP0311 must be considered still to be part of the contract of insurance, despite its inadvertent omission from the list of endorsements, just as it was before the address change. While there is no Illinois case law (nor any from other jurisdictions, as far as we are aware) to provide guidance on this issue, this conclusion seems to us obvious. Further, if endorsement PP0311 is part of the contract of insurance, so is endorsement PP0402.

The Frigos' argument that the elimination of endorsement PP0311 represented a unilateral increase in coverage with no increase in premium, as allowed by the general provisions of the contract, is only relevant if endorsement PP0402 is somehow read out of the contract because endorsement PP0311 is missing. Since this is not the case, and endorsement PP0402 remains in the contract prohibiting stacking of underinsured motorist coverages, this argument is unpersuasive.

It remains for us to determine whether the anti-stacking language contained in endorsement PP0402 is ambiguous. If it is, the language must be construed in favor of the Frigos, and stacking will be allowed. If it is not, the contract will be construed as written, and no stacking will be allowed.

A number of cases have examined insurance contracts with a similar limit of liability clause regarding *uninsured* motorist coverage, and all have been found to be unambiguous. The leading case is *Sharples v. General Casualty Co.* (1980), 85 Ill. App. 3d 899, 407 N.E.2d 674. There the plaintiff sought to stack uninsured motorist coverage for two automobiles which were covered by one policy of in-

surance issued by the defendant. The appellate court held that the following language was clear and unambiguous and that the policy should be applied as written:

"Limits of Liability: Regardless of the number of (1) persons or organizations who are insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage, or (4) automobiles or trailers to which this policy applies,

\* \* \*

Uninsured Motorist Coverage:

(D) The limit of liability for uninsured motorists coverage stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages, including damages for care or loss of services, because of bodily injury sustained by one person as a result of any one accident and, subject to the above provision respecting each person, the limit of liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages because of bodily injuries sustained by two or more persons as the result of any one accident." *Sharples*, 85 Ill. App. 3d at 899-90, 407 N.E.2d at 675.

Similarly, a plaintiff who was injured while a passenger in an uninsured vehicle was not permitted to stack the separate $20,000 limits of uninsured motorist coverage for each of three cars insured under one policy even though he was permitted recovery of $20,000 in uninsured motorist benefits in *Hanover Insurance Co. v. Cormack* (1979), 78 Ill. App. 3d 368, 396 N.E.2d 1076. In that case, the operative anti-stacking clauses were as follows:

" 'Regardless of the number of \*\*\* automobiles \*\*\* to which this policy applies \*\*\*

(C) the limit for Uninsured Motorist Coverage stated in the declarations as applicable to each accident is the total limit of the company's liability for all damages because of bodily injury sustained by one or more persons as a result of one accident.'

\*\*\*

'With respect to any occurrence, accident, death or loss to which this or any other automobile insurance policy issued to the named insured by the company also applies, the total limit of the company's liability under all such policies shall not exceed the highest applicable limit of the liability or benefit amount under any one such policy.' " (*Hanover*, 78 Ill. App. 3d at 370, 396 N.E.2d at 1077.)

Similar language was also upheld as unambiguous as regards uninsured motorist coverage in *Menke v. Country Mutual Insurance Co.* (1980), 78 Ill. 2d 420, 401 N.E.2d 539, and *Bailey v. Auto-Owners Insurance Co.* (1992), 229 Ill. App. 3d 514, 592 N.E.2d 1133. It is thus clear that anti-stacking clauses are enforceable and not void as against public policy.

While the above-cited cases all concerned uninsured motorist coverage as opposed to the underinsured motorist coverage at issue in this case, section 143a—2(5) of the Illinois Insurance Code specifically allows insurers who write underinsurance coverage in Illinois to place anti-stacking language in their policies:

"Nothing herein shall prohibit an insurer from setting forth policy terms and conditions which provide that if the insured has coverage available under this Section under more than one policy or provision of coverage, any recovery or benefits may be equal to, but may not exceed, the higher of the applicable limits of the respective coverage, and the limits of liability under this Section shall not be increased because of multiple motor vehicles covered under the same policy of insurance." 215 ILCS 5/143a—2(5) (West 1992).

In *Sulser v. Country Mutual Insurance Co.* (1992), 147 Ill. 2d 548, 591 N.E.2d 427, the Illinois Supreme Court stated that the intent of the legislature in providing for underinsured motorist coverage was to place the insured in the same position he or she would have occupied had he or she been injured by a motorist who carried liability insurance in the same amount as the policyholder. The supreme court then stated:

"A provision designed to offer insurance to 'fill the gap' between the claim and the tortfeasor's insurance was obviously not intended to allow the insured to recover amounts from the insurer over and above the coverage provided by the underinsured motorist policy.

***

*** When the insured opts for $100,000 in coverage against either uninsured or underinsured motorist risks, he is assured of receiving no more than that amount." *Sulser*, 147 Ill. 2d at 556-57, 591 N.E.2d at 430.

Additionally, courts have begun to construe anti-stacking language in *underinsured* motorist coverage. In *Obenland v. Economy Fire & Casualty Co.* (1992), 234 Ill. App. 3d 99, 599 N.E.2d 999, for example, after stating that the uninsured motorist amendatory endorsement conferred both uninsured and underinsured motorist coverage, the appellate court found the following language unambiguous:

"The limit of liability shown in the Declarations for Uninsured Motorists Coverage is our maximum limit of liability for all damages for bodily injury resulting from any one accident.
\*\*\*
This is the most we will pay regardless of the number of covered persons, claims made, vehicles or premiums shown in the Declarations, or vehicles involved in the accident.
Any amounts otherwise payable for damages under this coverage shall be reduced by all sums: Paid because of the bodily injury or property damage by or on behalf of persons or organizations who may be legally responsible." *Obenland*, 234 Ill. App. 3d at 105, 599 N.E.2d at 1002.

The United States District Court for the Northern District of Illinois, construing Illinois law, in *Johnson v. Safeco Insurance Co.* (N.D. Ill. 1992), 809 F. Supp. 602, *aff'd without op.* (7th Cir. 1993), 9 F.3d 112, found the following language to be unambiguous:

"Uninsured and Underinsured Motorists Coverage:
If this policy insures two or more automobiles or if any other automobile insurance policy issued by SAFECO applies to the same accident, the maximum limit of SAFECO's liability shall not exceed the highest limit applicable to any one automobile." (*Johnson*, 809 F. Supp. at 605.)

Additionally, within the uninsured and underinsured motorists provision, the policy in *Johnson* contained the following language:

"Regardless of the number of (1) persons or organizations who are insureds under this policy ... or (4) automobiles or 'trailers' to which this policy applies, the limit of liability for Uninsured and Underinsured Motorists coverage shown in the declarations for the vehicle involved in the accident as applicable to 'each person' is the limit of the company's liability for all damages ... sustained by one person as the result of any one accident and ... the limit of such liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages[.] Coverage on any other 'insured automobile' shall not be added to that coverage." (*Johnson*, 809 F. Supp. at 606.)

This language was also found unambiguous, following the holding in *Bailey v. Auto-Owners Insurance Co.* (1992), 229 Ill. App. 3d 514, 516-18, 592 N.E.2d 1133, 1135, that the introductory phrase "Regardless of the number of \*\*\* automobiles" is critical to such a finding.

■ The language in endorsement PP0402 parallels the language found unambiguous in these cases. It contains the language found critical to such a finding in *Bailey*. This court therefore finds this language clear and unambiguous.

The Frigos also argue, without citation to authority, that because they paid three separate premiums for underinsured motorist cover-

age on their three vehicles they may stack their coverage. The Illinois Supreme Court, however, has rejected such a *per se* rule; without ambiguity, merely paying a separate premium is not enough to stack coverages. *Stryker v. State Farm Mutual Automobile Insurance Co.* (1978), 74 Ill. 2d 507, 386 N.E.2d 36.

Because endorsements PP0311 and PP0402 remain in the contract and unambiguously prohibit stacking of underinsured motorist coverages, the circuit court erred in granting summary judgment to the Frigos on this issue as well as in denying summary judgment to Motors. We therefore reverse both holdings of the circuit court and grant summary judgment to Motors on this issue.

### III

Because we find that Motors is entitled to summary judgment on the first two issues, we need not reach the third and fourth issues.

For the reasons stated, we reverse the circuit court's granting of summary judgment to the Frigos and its denial of summary judgment to Motors, and we enter summary judgment for Motors. There are no genuine issues of material fact, and Motors is entitled to judgment as a matter of law. The issues regarding the counterclaim, the reopening of discovery, and the cross-appeal are moot.

Reversed.

SCARIANO, P.J., and HARTMAN, J., concur.