November 6, 1996

1-95-4384

KLEINWORT BENSON NORTH AMERICA, INC., ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County.
 )
 v. )
 )
QUANTUM FINANCIAL SERVICES, INC., )
 )
 Defendant-Appellant. )
____________________________________________) No. 92 CH 7876
 ) (Transferred to Law)
QUANTUM FINANCIAL SERVICES, INC., )
 )
 Counterplaintiff-Appellant, )
 )
 v. )
 )
KLEINWORT BENSON NORTH AMERICA, INC., )
KLEINWORT BENSON LTD., and )
MARCUS HUTCHINS, ) The Honorable
 ) David Lichtenstein,
 Counterdefendants-Appellees. ) Judge Presiding.

 PRESIDING JUSTICE HARTMAN delivered the opinion of the court:
 Claiming the existence of genuine, material issues of fact,
counterplaintiff Quantum Financial Services, Inc. (Quantum)
appeals the grant of summary judgment in favor of counterdefendants
Kleinwort Benson North America, Inc., Kleinwort Benson Ltd.,
(collectively, Kleinwort) and Marcus Hutchins on two counts of
Quantum's counterclaims. Quantum also appeals from the order
dismissing the remaining counts of Quantum's counterclaims as moot,
as well as an earlier ruling of the circuit court dismissing its
counterclaim for rescission. 
 Quantum questions whether the circuit court correctly ruled as
a matter of law that (1) Kleinwort's alleged misrepresentations
were immaterial; (2) Quantum sustained no damage from Kleinwort's
alleged fraud and breach of contract; and (3) Quantum's claim for
rescission was improperly dismissed. 
 The documents filed in support of and in opposition to
Kleinwort's summary judgment motion, read most strictly against
Kleinwort and most liberally in favor of Quantum, (Purtill v. Hess,
111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986)), reveal the following
facts. 
 Quantum, a futures commissions merchant, provided trade
clearing and execution services for its futures exchange clients. 
In 1991, it decided to expand its client base to include
institutional clients, such as banks. Virginia Trading Corporation
(VTC) was identified to it as a company having such business. VTC
was wholly owned by Kleinwort. In the business community, VTC was
known to service "high profile institutional accounts." After
Quantum contacted Kleinwort about acquiring VTC, the parties began
negotiating. 
 In April 1991, in the midst of negotiations for the VTC
purchase, Kleinwort disclosed to Quantum information about VTC in
a confidential five-page memorandum entitled "Project Troy." The
introduction to Project Troy stated that "Quantum *** has
approached Kleinwort *** to express its interest in acquiring the
brokerage division of its wholly-owned subsidiary, Virginia Trading
Corporation [VTC]. In connection with this proposal, Kleinwort ***
is hereby providing certain information on the brokerage division." 
Project Troy provided a "Statement of Income" and a "Schedule of
Membership Seats." 
 A portion of the report discussed VTC's workforce. The
Project Troy memorandum stated that:
 "VTC employs 50 individuals in its brokerage
 division. A seasoned six-man marketing team
 with over 50 years of combined industry
 experience leads the brokerage sales effort. 
 VTC's execution is acknowledged to be among
 the best in the industry. Exchange floor
 locations are staffed by experienced
 personnel, totalling 27." (Emphasis added.)
 On May 31, 1991, one month after Quantum received the
Project Troy memorandum, Quantum offered to purchase VTC by buying
100% of VTC's outstanding stock for approximately $6 million in
cash and commissions. Kleinwort accepted Quantum's offer and the
parties executed a "Stock Purchase and Brokerage Agreement"
(Agreement) on June 30, 1991. The Agreement provided that the
closing for the sale would be at 10 a.m. on July 31, 1991. 
 During the course of Quantum's pre-purchase investigation,
Quantum's then chairman, Leslie Rosenthal, asserted that if it were
not for VTC's "impressive institutional client base," Quantum would
not be interested in purchasing VTC. Kleinwort disclosed to
Quantum the identity of the individuals who made up VTC's "seasoned
six-man marketing team" to which it referred in the Project Troy
Memorandum. Quantum alleged that this marketing team constituted
an important component of the premium over book value of assets
that Quantum was willing to pay for VTC because it needed a viable
institutional sales force in order to maintain and increase the
type of institutional client base it sought to purchase.
 After the Agreement was signed, Kleinwort gave Quantum copies
of VTC's employment agreements with each of its six "seasoned"
salespersons. These documents listed the accounts for which the
individual salesperson received commissions. Quantum believed that
the salespersons had personal relationships with the clients listed
in their employment agreements and that the salespersons received
commissions on the clients' trades because of their activities
involving the client.
 These employment agreements were listed as "material
contracts" under the Agreement. The terms of the Agreement
included Kleinwort's representation that "[u]nder the heading
'Material Contracts,' the Seller Disclosure Schedule contains a
listing or description of all material business contracts to which
VTC *** will be a party." The Agreement also stated that "each
such contract is in full force and effect in all material respects"
and would remain so at the time of the closing. Kleinwort
explicitly acknowledged in the Agreement that it made these
representations about the "material contracts" as a "material
inducement" to Quantum to enter into the Agreement and consummate
the purchase of VTC.
 Only three members of VTC's above mentioned "seasoned six-man
marketing team" actually handled a "significant" amount of
institutional business: Edward Boehm, John Legittino, and David
Gibbs. Due to unfavorable reports Quantum obtained from Marcus
Hutchins, VTC's chief executive officer, concerning Boehm, Quantum
bought out Boehm's employment contract for $112,903. Legittino,
who supervised one of VTC's largest accounts, "Nippon," and
received a large percentage of resultant commissions, left VTC two
weeks before the closing date of the Agreement, taking the Nippon
account with him. 
 Of the three experienced employees handling a significant
amount of VTC's business then, only David Gibbs remained prior to
the closing. According to his employment letter, Gibbs was
responsible for, and received commissions on, some of VTC's biggest
and most prominent institutional clients: NCNB, First Union Corp.,
Dominion Bank, Mellon Bank and Norwest. Two of these accounts were
among the six named "large [institutional] accounts" listed by
Kleinwort in its Project Troy disclosures to Quantum. Gibbs also
had responsibility for soliciting new accounts and developing
further business with his existing accounts. 
 In June or July of 1991, Gerald Laurain, Quantum's
institutional sales manager, met with Gibbs to discuss Quantum's
plans and Gibbs' prospective new role within Quantum. Laurain
asked Gibbs many questions about Gibbs' clients, including the
names of the "key players," when Gibbs last saw these players, and
when Laurain and Gibbs should schedule visits with them to discuss
Quantum's acquisition of VTC. Gibbs did not then tell Laurain that
he was considering leaving VTC or that he was leaving VTC. 
 Nevertheless, Quantum heard a rumor that Gibbs was considering
leaving VTC and immediately made inquiries to Kleinwort. At that
point, Quantum was concerned that if Gibbs left, it no longer would
be purchasing an institutional sales force to service the client
base. Quantum attempted to speak with Gibbs, but could not locate
him because he was on vacation and "incommunicado" from July 8 to
July 29. 
 As the closing date approached, Quantum grew more concerned
about the status of Gibbs. Rosenthal sought specific assurances
from Hutchins by asking him if Gibbs was leaving VTC. According to
Rosenthal, Hutchins alleviated his concerns by stating that "given
Gibbs' history, there's absolutely no way that he would ever pick
up and leave [VTC] because [Hutchins] was basically responsible for
the education and experience and value-added *** services that
Gibbs provided to anybody, and in fact Gibbs would not think of
leaving [VTC's] employ if [Hutchins] told him not to." Hutchins
allegedly was asked to inform Quantum if anything happened with
Gibbs because Quantum believed that Gibbs was responsible for a
meaningful portion of VTC's institutional client base. Hutchins
was advised that the structure of the deal would be dramatically
altered if, after Legittino left, Gibbs also left. 
 Unknown to Quantum, during the time Gibbs was on vacation, he
was meeting with high-ranking officers from Barclays de Zoehe Wedd
Securities ("BZW") about possible employment in its newly formed
futures commission organization. Gibbs met with BZW's managing
director, institutional sales manager, and three executive
directors. Gibbs told the BZW officers that he possibly could
bring clients with him from VTC to BZW. Gibbs also represented to
BZW that he had positive relationships with his clients and that he
helped develop VTC's business with several large banks. BZW then
offered Gibbs a job as an institutional salesperson, starting
August 5, 1991. 
 On July 29, two days before the scheduled July 31 closing of
Kleinwort's VTC sale to Quantum, Gibbs returned from vacation and
went to VTC's offices to resign. Gibbs told Hutchins of his job
offer, and stated that he wanted to resign, effective immediately,
while Kleinwort still owned VTC. Instead of accepting his
resignation that day as Gibbs requested, Hutchins asked Gibbs to
return on the afternoon of Wednesday, July 31, the day of the
closing, and then resign. Gibbs replied that he would make an
official statement of resignation on the morning of July 31,
instead of the afternoon, because he understood (mistakenly) that
the closing of the sale to Quantum would take place at noon. Gibbs
in fact tendered his official resignation from VTC to Hutchins
before noon on July 31, 1991.
 On the date of the closing, rumors continued to circulate
regarding Gibbs' employment status at VTC. Laurain again sought to
ascertain the facts, but could not locate Gibbs. Laurain talked to
Hutchins. Despite the fact that Gibbs already had resigned,
Hutchins lied and told Laurain he did not think that Gibbs was
leaving. Instead, Hutchins responded that he had advised Gibbs
against leaving and would be very surprised if Gibbs actually left.
 Quantum did not learn of Gibbs' resignation until the
afternoon of July 31, after the closing and after Quantum had wired
approximately $6 million to Kleinwort to purchase VTC. When it
learned of Gibbs' resignation, Quantum immediately tried to stop
the wire transfer to Kleinwort, but was unable to do so. That
evening, Quantum's attorney faxed a letter to VTC advising that
Quantum considered Kleinwort to be in breach of the Agreement for
its failure to inform Quantum about the departures of Legittino and
Gibbs. The letter suggested that the principals of Quantum and
Kleinwort meet to resolve the matter.
 During early August 1991, Rosenthal met with Hutchins and
Brian Manning, chairman of VTC's Board, to discuss the departures
of Legittino and Gibbs. Hutchins and Manning lied again and
assured Quantum that they had not been forewarned of the
resignations of Legittino and Gibbs nor withheld or misrepresented
information to Quantum about those resignations. In reliance on
these assurances, Quantum withdrew the July 31, 1991 letter, which
stated that Kleinwort had breached the agreement.
 Kleinwort and Hutchins concede in their brief filed in this
court, however, the following: 
 "There is evidence in the record suggesting
 that -- prior to the closing on July 31, 1991 -
 - a junior VTC salesman named David Gibbs had
 resigned from VTC, that the Kleinwort Parties
 failed to inform Quantum of this event, and the
 Kleinwort Parties (through Marcus Hutchins) may
 have misrepresented to Quantum their knowledge
 regarding Gibbs' employment status. *** For
 purposes of both their summary judgment motion
 and this appeal, the Kleinwort Parties will
 assume that Quantum's allegations of
 nondisclosure and misrepresentations of Gibbs'
 employment status are true." 
 Kleinwort and Hutchins' concession of misrepresentation is
supported by Gibbs in his March 28, 1994 deposition, where he
stated that on July 29, 1991, he told Hutchins he was resigning,
"effective immediately." Gibbs further told Hutchins that it was
very important to him that he resign to VTC, not Quantum. 
According to Gibbs, Hutchins asked him to resign on the afternoon
of July 31. Gibbs declined because he believed that the closing of
Quantum's purchase of VTC would take place at noon on July 31. 
Gibbs told Hutchins that he would resign on the morning of July 31. 
Gibbs resigned from VTC before the closing took place.
 On August 14, 1992, Kleinwort and Fenchurch Capital
Management, which maintained an account at VTC, filed a complaint
against Quantum. In count I, Kleinwort and Fenchurch sought a
declaratory judgment that Kleinwort and Fenchurch did not breach
their agreement with Quantum or make a material misrepresentation
with regard to Gibbs' departure. In count II, Kleinwort and
Fenchurch sought the same relief, but with regard to Legittino's
departure. In count III, Kleinwort alleged that Quantum breached
the agreement by failing to pay Kleinwort money due under the
Agreement. In counts IV, V, and VI Kleinwort sought declaratory
judgments and damages for Quantum's failure to make payments under
the Agreement. Counts VII and VIII pertained to Fenchurch's claims
against Quantum. Finally, in count IX, Kleinwort and Fenchurch
sought damages for Quantum's breach of the Agreement with respect
to the payment of commissions. 
 On October 26, 1992, Quantum filed an answer and
counterclaims. In count I of its counterclaims, Quantum sought
rescission against Kleinwort, specifically alleging that it had
"offered to return the stock in VTC to Kleinwort in exchange for
refund of the purchase price." In count II of its counterclaims,
Quantum pled a cause of action for common law fraud against
Kleinwort, Fenchurch, Marcus Hutchins and Brian Manning. Count
III of Quantum's counterclaims pled a cause of action for breach of
express warranties against Kleinwort. The circuit court permitted
Quantum to file second amended counterclaims. Quantum's second
amended count I for rescission, however, was then dismissed by the
chancery court.
 The chancery court transferred the cause to the Law Division
of the Cook County Circuit Court on Kleinwort's motion. Kleinwort
and Hutchins moved for summary judgment on all punitive damage
claims and counts II and III of Quantum's second amended
counterclaims. On December 1, 1995, the court entered summary
judgment in favor of Kleinwort and against Quantum on Quantum's
second amended counterclaims and dismissed remaining claims on
Kleinwort's declaratory judgment action as moot. This appeal
followed.
 I
 Summary judgment, a drastic remedy to be granted only when
such remedy is clear and free from doubt (Skipper Marine
Electronics, Inc. v. United Parcel Service, Inc., 210 Ill. App. 3d
231, 234, 569 N.E.2d 55, 58 (1991)), should be allowed only where
the pleadings, depositions, admissions, exhibits and affidavits in
the record demonstrate that there is no genuine issue of material
fact and that the movant is entitled to judgment as a matter of
law. Vicorp Restaurants v. Corinco Insulating Co., 222 Ill. App.
3d 518, 525, 584 N.E.2d 229, 234 (1991), appeal denied, 144 Ill. 2d
643, 591 N.E.2d 32 (1992). In making that determination, the
foregoing documents must be construed strictly against the movant
and liberally in favor of the respondent (Mitchell v. Jewel Food
Stores, 142 Ill. 2d 152, 165, 568 N.E.2d 827 (1990)) and if
reasonable persons could draw different conclusions or inferences
from undisputed evidence, summary judgment must be denied. 
Skipper, 210 Ill. App. 3d at 236. See also Ainsworth Corp. v.
Cenco Inc., 107 Ill. App. 3d 435, 438-39, 437 N.E.2d 817, 820
(1982). 
 A circuit court's decision granting summary judgment is
reviewed de novo. Zoeller v. Augustine, 271 Ill. App. 3d 370, 374,
648 N.E.2d 939 (1995); Myers v. Health Specialists, S.C., 225 Ill.
App. 3d 68, 72, 587 N.E.2d 494, 497, appeal denied, 145 Ill. 2d
635, 596 N.E.2d 630 (1992). De novo review does not require
deference to the judgment of the circuit court, but the facts and
law are considered ab initio to determine whether the decision was
correct. Frigo v. Motors Insurance Corp., 271 Ill. App. 3d 50, 57,
648 N.E.2d 180, 184 (1995); Jarke v. Jackson Products, 258 Ill.
App. 3d 718, 721, 631 N.E.2d 233, 236 (1994). An order granting
a motion to dismiss pursuant to 735 ILCS 5/2-615 (West 1994) is
proper only when no set of facts would sustain the claim. Reuben
H. Donnelley Corp. v. Brauer, 275 Ill. App. 3d 300, 302, 655 N.E.2d
1162, 1165 (1995). A dismissal for failure to state a cause of
action involves a question of law; consequently, this review also
is de novo, and independent of the reasoning of the circuit court
on the question. Metrick v. Chatz, 266 Ill. App. 3d 649, 652, 639
N.E.2d 198, 200, appeal denied, 158 Ill. 2d 553, 645 N.E.2d 1359
(1994).
 II
 Quantum first argues that the circuit court erred when it
ruled, as a matter of law, that Kleinwort's misrepresentations and
omissions regarding David Gibbs were immaterial. 
 A misrepresentation is material if the plaintiff would have
acted differently had he been aware of the falsity of the
statement. Black v. Iovino, 219 Ill. App. 3d 378, 391, 580 N.E.2d
139, 147 (1991), appeal denied, 143 Ill. 2d 636 (1992); Brown v.
Broadway Perryville Lumber Co., 156 Ill. App. 3d 16, 24, 508 N.E.2d
1170, 1176 (1987); Buechin v. Ogden Chrysler-Plymouth, Inc., 159
Ill. App. 3d 237, 248, 511 N.E.2d 1330, 1337 (1987); Chapman v.
Hosek, 131 Ill. App. 3d 180, 186, 475 N.E.2d 593, 598 (1985);
Obermaier v. Obermaier, 128 Ill. App. 3d 602, 606, 470 N.E.2d 1047,
1051 (1984); Perlman v. Time, Inc., 64 Ill. App. 3d 190, 197, 380
N.E.2d 1040, 1046 (1978). A misrepresentation also is material if
the one making it knew that the statement was likely to induce the
recipient to engage in the conduct in question. Mother Earth, Ltd.
v. Strawberry Camel, Ltd., 72 Ill. App. 3d 37, 49, 390 N.E.2d 393,
404 (1979). See also Restatement (2d) of Law, Torts  538(2)(b),
at 80 (1977).
 Although Kleinwort suggests that Gibbs' importance to Quantum
was undisclosed, there is record evidence from which a factfinder
could conclude that Kleinwort lied to Quantum because it knew
Quantum would not have closed the deal had it known the truth about
Gibbs' resignation. Kleinwort was told several times that the only
reason Quantum wished to purchase VTC was to acquire an
institutional client base. Kleinwort touted Gibbs as a member of
the "seasoned" six-person sales team for institutional clients
highlighted in the confidential Project Troy memorandum. Two other
such seasoned salesmen already had left. Gibbs had been servicing
high-profile institutional clients. The Agreement between Quantum
and Kleinwort itself listed Gibbs' employment as material to the
sale. Quantum inquired several times about Gibbs' employment
status. Kleinwort, admittedly, knowingly lied to Quantum about
Gibbs' employment status. 
 Were these knowing lies material? Kleinwort says no; however,
substantial evidence demonstrates that in order to induce Quantum
to purchase VTC, Kleinwort heralded VTC's sales force in the
Project Troy memorandum it prepared for Quantum. Kleinwort counted
Gibbs as one of its six "seasoned" salespersons, and represented
him to be the responsible salesperson for several of VTC's most
prominent accounts. As an acknowledged "material inducement" to
persuade Quantum to enter into and consummate the Agreement,
Kleinwort represented that Gibbs' employment agreement constituted
a "material contract" that would be in full force and effect at the
time of closing. 
 Even after the parties signed the Agreement, which had
acknowledged Gibbs' contract as "material," Quantum continued to
inquire of Kleinwort about Gibbs. After the departure of
Legittino, Rosenthal specifically asked Hutchins to advise him of
any further "defections," and later specifically asked Hutchins if
Gibbs was leaving, because Quantum considered Gibbs to be
important. On the day of closing, Laurain expressly asked Hutchins
whether Gibbs was leaving, and Hutchins lied when he answered in
the negative. When Quantum learned that Gibbs resigned, it
immediately, but unsuccessfully, tried to stop the wire transfer of
approximately $6 million to Kleinwort.
 A factfinder reasonably could conclude from the foregoing that
Quantum would have acted differently if Kleinwort had been truthful
about Gibbs' employment status and that Kleinwort knew that lying
about Gibbs would induce Quantum to proceed with the closing. 
Given this evidence, it is for the factfinder to determine whether
Kleinwort's misrepresentations were material, not the circuit court
as a matter of law. 
 Accordingly, the circuit court erred. The grant of summary
judgment on count II, therefore, must be reversed and the cause
remanded for trial.
 III
 The circuit court ruled that Kleinwort was entitled to summary
judgment because Quantum failed to produce any evidence showing it
was damaged by Kleinwort's fraud or breach of contract.
 Kleinwort asserts that there was no difference in the value
of VTC with or without Gibbs. At the time the Agreement was signed
on June 30, 1991, Quantum bargained with Kleinwort to buy VTC,
which Kleinwort claimed possessed both an institutional client base
and an institutional sales force, which included Boehm, Legittino
and Gibbs. Between June 30 and July 31, Boehm and Legittino left
that sales force, leaving Gibbs as the only remaining experienced
institutional salesperson having had significant customer contacts. 
Within hours of sending a wire transfer of $6 million to Kleinwort
on July 31, 1991, Quantum learned the truth about Gibbs having
resigned from VTC prior to the closing. 
 Direct record evidence would permit a factfinder reasonably to
conclude that Gibbs added value to VTC. Gibbs, a member of VTC's
self-proclaimed "seasoned six-man marketing team," as listed in the
Project Troy memorandum, was one of only three team members with
significant experience in handling institutional accounts. He was
the only one remaining at VTC at the time before the closing. 
Gibbs' letter of employment with VTC contained an impressive list
of institutional clients with whom he had day-to-day contact. He
provided these customers with, what Hutchins described as, "value-
added services." It was Gibbs who received commissions on their
trades, buttressing the importance of his relationships to these
clients. 
 A factfinder also could consider the conduct of BZW, Gibbs'
new employer, as evidence supporting this evaluation of Gibbs as a
salesperson. Gibbs testified that high-ranking officials at BZW
interviewed him for a new sales position in July of 1991 -- the
same month in which Quantum purchased VTC. Gibbs told BZW
officials that he had good personal relationships with his clients
and possibly could deliver to BZW the very institutional clientele
which Quantum thought it was acquiring. BZW hired him as an
institutional salesperson. 
 As well, Kleinwort's own appraisement of Gibbs supports the
foregoing evidence. Michael Griffin, one of Kleinwort's agents
during the sale, admitted that a marketing team is an important
factor to consider in valuing the firm. In connection with this
sale, VTC proclaimed that it had a "seasoned six-man marketing team
with over 50 years of combined industry experience," a factor that
evidently added value to VTC. Manning, VTC's chairman, also
admitted that VTC's "seasoned six-man marketing team" was a
"positive attribute." In sum, a factfinder could conclude that
Gibbs indeed was an important component of this team. 
 Kleinwort's other actions also present strong evidence from
which a factfinder could infer that Gibbs was a valuable
salesperson. If Gibbs had so little value to VTC's sale, as
Kleinwort claims, Hutchins could have said as much when asked about
the possibility of Gibbs leaving. Instead, he lied and denied any
knowledge about Gibbs' resignation. An inference readily could be
drawn that Hutchins would not have felt compelled to lie to Quantum
about his resignation if Gibbs had no value.
 The opinion given by Quantum's expert, Sheldon B. Cohen, also
provides evidence that Gibbs' employment added value to VTC. Cohen
testified that Gibbs had a lengthy list of reputable institutional
business clients and that Gibbs was paid commissions on those
clients' trades, an indication that he, rather than anyone else,
had a material relationship with these clients. Because of his
list of clients and his experience, Cohen testified that as of July
31, 1991, Gibbs was the most important salesperson left at VTC. 
See Rock v. Pickleman, 214 Ill. App. 3d 368, 377, 574 N.E.2d 682,
688 (1990). 
 There was evidence from which a factfinder can assess an
amount of damage Quantum sustained on the date of closing, if any,
through Cohen's testimony. In determining the amount of damages to
be awarded in fraud cases, Illinois courts typically apply the
"benefit-of-the-bargain" rule. See Gerill Corp. v. Jack L.
Hargrove Builders, Inc., 128 Ill. 2d 179, 196, 538 N.E.2d 530, 537-
38, cert. denied, 493 U.S. 894 (1989); Giammanco v. Giammanco, 253
Ill. App. 3d 750, 759, 625 N.E.2d 990, 998 (1993). Under this
rule, damages are determined by assessing the difference between
the actual value of the property sold and the value of the property
had the representations been true. Gerill, 128 Ill. 2d at 196, 530
N.E.2d at 537-38. Was there a difference between the value VTC
would have had with Gibbs and the value of VTC without Gibbs,
contrary to Kleinwort's assertion?
 It was Cohen's opinion that, if Quantum were merely buying
VTC's accounts, under the custom in the industry, it would not pay
any premium over book value of assets, but pay only trailing
commissions on those accounts for a period of time after the sale. 
According to Cohen, because Quantum bargained for an institutional
sales force as part of the Agreement, the influx of human capital
made it reasonable and appropriate to pay a premium over book value
of assets. He estimated that premium at approximately $2 million,
based upon: (1) the $1,000,000 up-front cash payment by Quantum;
(2) $749,104, which represents the cost of the free trading to
Kleinwort's proprietary accounts under section 2.01(e) of the
Agreement; and (3) Quantum's $112,903 buy-out of Boehm. The
premium was negotiated between a willing seller and willing buyer
and accurately reflects VTC's value over book on July 31, 1991, if
the institutional sales force had been intact at the date of
closing. See also Posner v. Davis, 76 Ill. App. 3d 638, 645, 395
N.E.2d 133, 138 (1979).
 According to Cohen, Quantum did not receive what it bargained
for. Although Quantum remained willing to close the deal after the
departure of two institutional salespersons, the departure of Gibbs
left VTC without any experienced institutional sales force. VTC,
absent any institutional sales force, had no value beyond book
value of assets. Quantum's damages due to Kleinwort's fraud and
breach of contract therefore were computable. A question for a
factfinder existed as to the amount of damages, if any, caused by
Kleinwort's alleged fraud. 
 Further, a presumption of nominal damages obtains upon proof
that a legal wrong has been committed; such damages are sufficient
to sustain a cause of action. Application of Busse, 124 Ill. App.
3d 433, 438, 464 N.E.2d 651, 655 (1984). Assignees of fraud claims
also have been permitted to receive punitive damages. Federal
Deposit Insurance Corp. v. W.R. Grace & Co., 691 F. Supp. 87, 92
(N.D. Ill. 1988), aff'd in part, rev'd on other grounds, 877 F.2d
614 (7th Cir. 1989); First Federal Savings & Loan Ass'n v.
Oppenheim, 629 F. Supp. 427, 446-47 (S.D. N.Y. 1986). In Grunloh
v. Effingham Equity, Inc., 174 Ill. App. 3d 508, 528 N.E.2d 1031
(1988), relied upon by Kleinwort, the survivability of property
damage claims which had been assigned was involved, not a claim for
fraud as is here presented. 
 Accordingly, the circuit court's ruling, as a matter of law,
that the departure of Gibbs caused no damage whatsoever to Quantum
or its assignees, was error and must be reversed. 
 IV
 The circuit court granted Kleinwort summary judgment on
Quantum's breach of contact claim, count III of the second amended
counterclaim, to which Quantum assigns error. Article V at section
5.08 of the Agreement provided:
 "Under the heading 'Material Contract,' the
 Seller Disclosure Schedule contains a listing
 or description of all material business
 contracts to which VTC or VFM will be a party
 after the consummation of the Restructuring
 Transactions. Each such contract is in full
 force and effect in all material respects, and
 neither VTC nor VFM is in breach of any such
 contract in any material respect."
 Section 10.01(a) of the Agreement obligates Quantum to consummate
the purchase of VTC, subject to the satisfaction or waiver of the
following condition:
 "The Seller's representations and warranties
 set forth in Article IV and Article V above
 will be true and correct in all material
 respects at and as of the Closing Time as
 though then made and as though the Closing
 Date were substituted for the date of this
 Agreement throughout such representations and
 warranties ***."
 There is neither claim nor evidence that Quantum waived the
condition that Gibbs' employment agreement would be in force at the
time of closing.
 A breach of contract claim requires proof of (1) the existence
of a contract; (2) the performance of the contract by plaintiff;
(3) the breach of the contract by defendant; and (4) the existence
of damages resulting from the breach. Village of Orland Park v.
First Federal Savings & Loan Ass'n, 135 Ill. App. 3d 520, 529, 481
N.E.2d 946, 952 (1985). There was sufficient evidence in the
record showing that Kleinwort breached the Agreement by
representing Gibbs' employment contract as having been in full
force and effect at the time of closing, when Kleinwort knew Gibbs
already had resigned.
 Kleinwort asserts that summary judgment was proper because (1)
the breach was not material and (2) the breach caused no damage,
basing its materiality argument on the terms of the Agreement;
however, nothing in the Agreement requires Quantum to "show through
independent means that Gibbs' continued employment was material in
order to establish [its] breach of contract claim," as Kleinwort
suggests. Section 11.03 of the Agreement provides that "[t]he
Seller will indemnify the Buyer *** against any loss *** which the
Buyer may suffer *** as a result of the breach by the Seller of any
representation *** contained in *** Article V above ***." 
(Emphasis supplied.) Quantum's recovery under the Agreement is not
limited to "material" breaches.
 As shown in the preceding point, there is substantial record
evidence from which a factfinder could surmise that Quantum
suffered damage as a result of Gibbs' resignation.
 The circuit court's grant of summary judgment also must be
reversed on this facet of the case, and the cause is remanded for
further proceedings on this point.
 V
 Quantum lastly claims that the circuit court erred when it
dismissed Quantum's rescission claim under count I because
Kleinwort's fraud in the inducement renders the entire Agreement
voidable. Kleinwort counters, however, that under the express and
unambiguous terms of section 11.02 of the Agreement, the remedy of
rescission is specifically precluded:
 "No claims may be brought or maintained
 against the Buyer or the Seller *** by virtue
 of or based upon any alleged misstatement,
 omission, inaccuracy in, or breach of any
 representation, warranty or covenant set forth
 or contained in this Agreement *** (other than
 as provided in Section 11.03 with respect to
 the representations and warranties contained
 in Article IV, Article V and Article VI above
 or as provided in Article VII above), except
 to the extent that such claim is the result of
 common-law fraud, intentional omission or
 deliberate concealment by Such Person;
 provided, that in no event will the Buyer or
 its successors or permitted assigns be
 entitled to claim or seek rescission of the
 purchase or sale of the Shares consummated
 pursuant to this Agreement, any right of
 rescission or rights to damages which the
 Buyer might otherwise have or be deemed to
 have being hereby expressly waived and any
 claims or judgments being limited
 accordingly."
 Accordingly, Kleinwort argues, rescission, as a remedy, is squarely
precluded by the language of the Agreement. Kleinwort also asserts
that section 11.02 of the Agreement is not voidable on the basis of
fraud because the misrepresentations and omissions regarding Gibbs'
employment status occurred after the Agreement was signed on June
30, 1991.
 Fraud occurring after the execution of a contract, but before
closing, however, provides a basis for avoiding obligations under
the contract where it can be shown that the fraud relates to one of
the conditions for closing. See Schwaner v. Belvidere Medical
Bldg. Partnership, 155 Ill. App. 3d 976, 987, 508 N.E.2d 522, 529
(1987). Cf. Federal Deposit, 877 F.2d at 622. Quantum's
obligation to close under the Agreement on July 31, 1991 was based
upon the "material contracts" listed in the Seller Disclosure
Statement, which was in effect between the date of its Agreement
and the date of the closing. Had Quantum known of Kleinwort's
fraud, Quantum could have chosen to rescind its obligation to close
under the Agreement. Accordingly, the Agreement as a whole is
voidable, and Quantum may seek rescission.
 Kleinwort also maintains that section 11.02 of the Agreement
is not void as against public policy because it limits only the
remedies to be sought against the intentional wrongdoer. Public
policy concerns enunciated in Zimmerman v. Northfield Real Estate,
Inc., 156 Ill. App. 3d 154, 165, 510 N.E.2d 409, 415 (1986), appeal
denied, 116 Ill. 2d 578, 515 N.E.2d 129 (1987), are applicable
here. The Zimmerman decision is consistent with a long line of
cases which hold that exculpatory clauses for wilful and wanton
conduct are void as a matter of public policy. See, e.g., Davis v.
Commonwealth Edison Co., Inc., 61 Ill. 2d 494, 500-01, 336 N.E.2d
881, 885 (1975); Falkner v. Hinckley Parachute Center, Inc., 178
Ill. App. 3d 597, 604, 533 N.E.2d 941, 946 (1989); Third Swansea
Properties, Inc. v. Ockerlund Construction Co., 41 Ill. App. 3d
894, 897, 354 N.E.2d 148, 150 (1976).
 Section 11.02, insofar as it purports to limit Kleinwort's
liability for fraud under the circumstances present here, is void
as against public policy and cannot be enforced so as to preclude
Quantum from seeking rescission of the Agreement. Accordingly, the
circuit court erred in dismissing Quantum's rescission claim.
 It may be true, as Kleinwort contends, that Quantum's
rescission claim is no longer viable because the real parties in
interest no longer own VTC. Nevertheless, it is within the circuit
court's discretion to fashion an equitable remedy of rescission if
the restoration of the status quo is impossible. Here, the circuit
court itself has never considered whether such relief could, or
should, be granted. This is an issue to be decided by the circuit
court in the first instance, after an evidentiary hearing. 
 For the reasons set forth above, we reverse the judgment of
the circuit court, which dismissed count I of Quantum's
counterclaims, and which granted summary judgment to the Kleinwort
parties on Quantum's counterclaims, Counts II and III. The cause
is remanded for further proceedings consistent with the foregoing
opinion.
 Reversed and remanded.
 SCARIANO and DiVITO, JJ., concur.